813 F.2d 1255
 2 Indiv.Empl.Rts.Cas. 1405
 Juan A. MENDEZ-PALOU, Plaintiff, Appellee,
v.
Santos ROHENA-BETANCOURT, etc., Defendant, Appellant.
Jose M. RODRIGUEZ RAMIREZ, Plaintiff, Appellee,
v.
Antonio GONZALEZ-CHAPEL, etc., Defendant, Appellant.
Rafael GIMENEZ BOEHM, Plaintiff, Appellee,
v.
Jose L. RIEFKOHL, etc., Defendant, Appellant.
 Nos. 86-1267, 86-1555 and 86-1631.
 United States Court of Appeals,
First Circuit.
 Argued Nov. 7, 1986.
Decided March 10, 1987.
 
 Manuel Alvarado with whom Saldana, Rey, Moran & Alvarado, Santurce, P.R., Hector Rivera Cruz, Secretary of Justice, and Rafael Ortiz Carrion, Sol. Gen., were on brief for defendant, appellant in No. 86-1267.
 Jose Hamid Rivera with whom Saldana, Rey, Moran & Alvarado, Santurce, P.R., Hector Rivera Cruz, Secretary of Justice, and Rafael Ortiz Carrion, Sol. Gen., were on briefs for defendants, appellants in Nos. 86-1555 and 86-1631.
 Pedro Miranda Corrada, San Jose, P.R., with whom Hector Urgell Cuebas, Santurce, P.R., and Jose Roberto Feijoo were on brief for plaintiff, appellee in No. 86-1267.
 Hector Gonzalez Lopez, San Juan, P.R., with whom Hector Urgell Cuebas, Santurce, P.R., Pedro Miranda Corrada, San Juan, P.R., and Jose Roberto Feijoo were on brief for plaintiff, appellee in No. 86-1555.
 Hector Urgell Cuebas, Santurce, P.R., with whom Pedro Miranda Corrada, San Juan, P.R., and Jose Roberto Feijoo were on brief for plaintiff, appellee in No. 86-1631.
 Before COFFIN, BOWNES and BREYER, Circuit Judges.
 COFFIN, Circuit Judge.
 
 
 1
 Plaintiffs-appellees, Puerto Rico government employees who were discharged or demoted following the 1984 gubernatorial election, commenced separate actions under 42 U.S.C. Sec. 1983 seeking damages and reinstatement. All three appellees claim that they were dismissed because of their affiliation with the Partido Nuevo Progresista ("PNP"), the party that ruled Puerto Rico from 1977 to 1985, but was defeated by the Partido Popular Democratico ("PPD") in the last election. Defendants-appellants, Puerto Rico public officials, sought partial summary judgment on the basis of their qualified immunity from actions seeking damages. Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 3020 n. 12, 82 L.Ed.2d 139 (1984); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The courts below denied defendants' motions for summary judgment and these appeals ensued. We have jurisdiction to consider on interlocutory appeal the narrow question of whether the denials of summary judgment based on defendants' claims of qualified immunity were proper. Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); De Abadia v. Izquierdo Mora, 792 F.2d 1187, 1190 (1st Cir.1986). We vacate the orders and remand the cases for the entry of partial summary judgment on the basis of qualified immunity in favor of all three appellants.I. Factual Setting
 
 
 2
 This opinion disposes of three appeals that were briefed and argued separately before this panel. The cases all involve the same legal principles and arguments, although each involves a different position in the hierarchy of the Puerto Rico government.
 
 
 3
 In No. 86-1267, plaintiff-appellee Juan A. Mendez-Palou claims that, due to his affiliation with the PNP, he was discharged from his position as Director of Administration for the Puerto Rico Environmental Quality Board ("EQB") by defendant-appellant Santos Rohena-Betancourt, current President of the EQB.
 
 
 4
 Similarly, in No. 86-1555, plaintiff-appellee Jose M. Rodriguez Ramirez contends that, because of his political affiliation, he was demoted from his position as Assistant Secretary for Special Services in the Puerto Rico Department of Agriculture ("DOA") and reinstalled in his last career position by defendant-appellant Antonio Gonzalez-Chapel, former Secretary of Agriculture.[1]
 
 
 5
 Finally, in No. 86-1631, plaintiff-appellee Rafael Gimenez Boehm alleges that, due to his support for the PNP, he was dismissed from his position as Deputy Executive Director for Special Affairs in the Puerto Rico Aqueduct and Sewers Authority ("ASA") by defendant-appellant Jose L. Riefkohl, former Acting Director of the ASA.[2]
 
 
 6
 II. First Amendment Doctrine.
 
 
 7
 We first review the substantive law relevant to dismissals motivated by partisan political concerns. Although patronage dismissals never used to be regarded as violating the federal Constitution, the Supreme Court's decisions in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), "marked a substantial change in the law." De Abadia v. Izquierdo Mora, 792 F.2d at 1191. Elrod held for the first time that public employees who allege that they were discharged due to their political affiliation state a claim for violation of their first and fourteenth amendment rights. 427 U.S. at 373, 96 S.Ct. at 2689. After Elrod, therefore, the vast majority of public employees enjoy constitutional protection from politically motivated dismissal. The Supreme Court, however, did not extend this protection to all public employees, noting that the first amendment must yield to the vital interest of preserving representative government whenever elected officials choose to replace underlings employed in "policymaking" or "confidential" positions. See Elrod, 427 U.S. at 367, 96 S.Ct. at 2687; id. at 375, 96 S.Ct. at 2690 (Stewart, J., concurring).
 
 
 8
 The Branti court, after demonstrating that the "policymaking" and "confidential" labels employed in Elrod were both overinclusive and under inclusive, opted instead for a totality of the circumstances test. Although consistent with Elrod, Branti held that "the ultimate inquiry ... is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518, 100 S.Ct. at 1295. Since the Supreme Court's pronouncement in Branti, several courts, including our own, have begun to employ the new test to demarcate the boundary of first amendment protection from politically motivated discharge. See Jimenez Fuentes v. Torres Gaztambide, 803 F.2d 1, 5-6 (1st Cir.1986) (en banc) (collecting cases).
 
 
 9
 In Jimenez Fuentes we attempted to fashion a workable approach to deciding when a particular position is excepted from first amendment protection, setting out a two-part analysis for cases involving alleged patronage dismissals. Jimenez Fuentes, 803 F.2d at 5. We first ask, as a threshold inquiry, "whether the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests.... [or] concerns.' " Id. at 6 (quoting Branti, 445 U.S. at 519, 100 S.Ct. at 1295). In making this determination we generally find it helpful to consider whether the agency employing the plaintiff handled matters potentially subject to partisan political differences and to focus upon how the plaintiff's position influenced the resolution of such matters. This step is designed to cut off from further consideration those positions involving matters devoid of partisan concerns, such as the " 'proper flow of work' in an agency," see De Choudens v. Government Development Bank of Puerto Rico, 801 F.2d 5, 10 (1st Cir.1986) (en banc), or the preferred accounting method or computer system.
 
 
 10
 Regardless of the position of an employee within the government hierarchy, or the broad scope of his or her duties, if the employee is responsible only for duties that are measured solely by strictly technical or professional criteria, the job is nonpartisan in nature and not properly a target of patronage dismissal. Although government employees may have differing views concerning an important technical or operational matter--for instance, the proper method of accounting to be employed or the preferred plan for computerizing an agency--such a disagreement does not itself involve an issue implicating partisan political differences and is not the sort of "policy" dispute recognized as relevant by Elrod and Branti. We further note that, for a position to pass the first threshold, there need not exist presently a political disagreement over the proper role of government in the particular area of governance at issue. The position at issue need only involve "decisionmaking on issues where there is room for political disagreement on goals or their implementation." Jimenez Fuentes, 803 F.2d at 6 (emphasis supplied).
 
 
 11
 If the first inquiry is satisfied, we then examine the plaintiff's job responsibilities in some detail "to determine whether [the position involved] resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." Jimenez Fuentes, 803 F.2d at 6. In conducting this second inquiry we focus upon the "powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." Id. In this regard, the actual past duties of the discharged employee are irrelevant if the position inherently encompasses more expansive powers and more important functions that would tend to make political affiliation an appropriate requirement for effective performance. Id.
 
 
 12
 Despite this recent attempt to clarify the contours of the Elrod-Branti doctrine, the posture of the instant cases precludes us from relying solely on our opinion in Jimenez Fuentes. The only question before us in these cases is whether the appellants were immune from a section 1983 action for damages and thus entitled to partial summary judgment. This question requires only that we assess the law as it existed at the time of the plaintiffs' discharges, thus rendering the Jimenez Fuentes decision outside the scope of our review.
 
 
 13
 Jimenez Fuentes is relevant in one significant respect, however. In that case, we pulled together the "considerable body of case law from circuit courts of appeal and district courts" that has emerged in the aftermath of Elrod and Branti. Jimenez Fuentes, 803 F.2d at 5. Along with the Supreme Court decisions, these cases are our primary guideposts in answering the narrow question before us: was it clearly established in 1985 that plaintiffs were entitled to protection from political discharge from their particular positions?
 
 
 14
 The relevance of these cases to our task today derives not from what they tell us about the specific positions for which political affiliation is an appropriate requirement. Indeed, the fact-specific nature of the analyses performed by these other courts makes it difficult in any given case to decide the merits solely on the basis of precedent. Rather, these cases are significant for what they do not tell us. The nature of the precedent plainly demonstrates that "[a]lthough the law seems clear at either end of the Elrod-Branti spectrum, not enough precedent dealing with upper-level governmental positions in the middle of the spectrum ha[d] yet emerged to enable" the defendants in the instant cases to determine conclusively whether plaintiffs were entitled to first amendment protection. De Abadia, 792 F.2d at 1194 (Campbell, C.J., concurring). Thus, there was no clearly established constitutional protection against patronage dismissal for those individuals whose positions potentially concerned matters of partisan political interest and involved at least a modicum of policymaking responsibility, access to confidential information, or official communication.
 
 
 15
 We shall discuss in Section IV below why we conclude that the particular positions at issue in the cases before us today were not clearly protected under the Elrod-Branti doctrine. In making these determinations, we found it particularly useful to keep in mind the catalogue of relevant factors developed by Judge Weinstein:
 
 
 16
 Among the indicia that locate a job along the spectrum between policymaker and clerk are: relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, contact with elected officials and responsiveness to partisan politics and political leaders.
 
 
 17
 Ecker v. Cohalan, 542 F.Supp. 896, 901 (E.D.N.Y.1982) (quoted in Jimenez Fuentes, 803 F.2d at 7; De Abadia, 792 F.2d at 1194 n. 1 (Campbell, C.J., concurring)). Before considering the positions, however, we briefly describe the contours of our interlocutory review on the issue of qualified immunity.
 
 
 18
 III. Qualified Immunity.
 
 
 19
 The doctrine of qualified immunity shields a public official from liability for civil damages in a section 1983 action if, at the time of the challenged action, the statutory or constitutional right allegedly violated was not "clearly established." Bonitz v. Fair, 804 F.2d 164, 166 (1st Cir.1986) (citing Davis v. Scherer, 104 S.Ct. at 3020 n. 12; Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738); Blackburn v. Snow, 771 F.2d 556, 569 (1st Cir.1985). The district courts in the cases presently before us concluded that defendants were not entitled to qualified immunity because Elrod and Branti clearly established that the first amendment protects government employees from discharges based on political affiliation. This characterization of the qualified immunity issue is incorrect, however, because it fails to account for the significant exception carved out by the Supreme Court for positions for which "party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518, 100 S.Ct. at 1295. Rather than ask generally whether it was clearly established that the first amendment is implicated in this sort of case, the district courts should have considered whether it was clearly established that employees in the particular positions at issue, in light of the responsibilities inherent in those positions, were protected from patronage dismissal. See Cheveras Pacheco v. Rivera Gonzalez, 809 F.2d 125, 127 (1st Cir.1987).
 
 
 20
 In answering this question on interlocutory appeal, "[w]e are not to 'consider the correctness of the plaintiff's facts, nor even determine whether the plaintiff's allegations actually state a claim.' " Bonitz, 804 F.2d at 166 (quoting Mitchell, 105 S.Ct. at 2816). Rather, we are to address the purely legal issue of " 'whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.' " Bonitz, 804 F.2d at 166 (quoting Mitchell, 105 S.Ct. at 2816 & n. 9). In cases such as Bonitz, where the plaintiff has alleged sufficient facts for us to determine whether the right allegedly violated was clearly established, we need look no further than the plaintiff's complaint or affidavit. As we recognized in Bonitz, however, some plaintiffs do not allege facts sufficient for us "to ask the immunity question." Id. at 168 n. 4. This situation may arise either because the plaintiff has alleged the facts defining the harm in sketchy fashion, or because--as in cases such as those before us today--the plaintiff has failed to recognize that the right in question does not apply to all individuals and neglected to indicate why he or she falls within the sphere of protection. In either type of case we must look beyond the plaintiff's bare allegations and consider other uncontested facts in the record that will permit us to address the immunity question. See, e.g., De Abadia, 792 F.2d at 1194 (Campbell, C.J., concurring) (court considered certified copy of job classification questionnaire signed by plaintiff).
 
 
 21
 As in De Abadia, the allegations contained in the complaints we consider today are insufficient for us to determine whether Branti and its progeny clearly protected plaintiffs against politically motivated discharge. Each plaintiff has simply provided his job title and averred generally that his position neither involved the formulation of policy nor required him to be affiliated with the same political party as the Governor of the Commonwealth. We therefore must consider other undisputed record facts not contained in the complaints. Fortunately, the record in these political discharge cases often contains an undisputed Job Classification Questionnaire or other job description that outlines the functions of the particular position at issue. Whenever possible, we will rely upon this document because it contains precisely the information we need concerning the position's inherent powers and responsibilities to address the issue of qualified immunity. With this in mind, we now consider each of the plaintiffs' job duties.
 
 
 22
 IV. Plaintiffs' Positions.
 
 
 23
 In light of the foregoing analysis, we must determine whether the Elrod-Branti doctrine clearly established protection against politically motivated dismissal for each of the three appellees involved here. We treat each separately.
 
 
 24
 A. Mendez-Palou: Director of Administration, Environmental Quality Board.
 
 
 25
 Mendez-Palou served as the Director of Administration for the Environmental Quality Board, a position classified as a trust or confidential position by the Puerto Rico Public Service Personnel Act. P.R.Laws Ann. tit. 3, Sec. 1350. The EQB is charged with the politically sensitive mission of recommending "public policy to encourage and promote the improvement of environmental quality" and establishing "standards for the quality and purity of the environment." P.R.Laws Ann. tit. 12, Sec. 1131(4), (12). Clearly, the agency's mandate encompasses issues that potentially involve partisan political disagreement concerning policy goals and implementation. The extensive powers of the EQB's Director of Administration, moreover, derive directly from the delegation of the President's complete power to control all aspects of the EQB's vital "technical and administrative activities." P.R.Laws Ann. tit. 12, Sec. 1130(2). It thus appears that the Director of Administration possesses top level responsibility for the administration of an agency that could potentially handle matters of partisan political concern with some frequency.
 
 
 26
 The record in Mendez-Palou's case contains an uncontested official job description prepared by the Puerto Rico Central Office of Personnel Administration ("COPA"). This job description states that the Director of Administration, although subject to the immediate direction of the President of the EQB, receives only general instructions and superficial supervision. Furthermore, the COPA description lists five discrete duties and responsibilities for the position. The Director of Administration:
 
 
 27
 1. Participates as counsellor of the President in all matters related to the administrative mechanism of the Agency, particularly in the formulation and establishment of public policy pertaining to the administrative area, pursuant to the statute that creates the Environmental Quality Board.
 
 
 28
 2. Is responsible for planning, coordinating and directing all administrative functions that develop through the Personnel Division and the General Services Division of the Environmental Quality Board.
 
 
 29
 3. Prepares lectures, bulletins, memorandums, responses and consultations related to whatever administrative activities the President, on his own initiative, may assign him.
 
 
 30
 4. Represents the President in activities and/or meetings, as delegated by him.
 
 
 31
 5. Performs other related tasks that the President may entrust to him.
 
 
 32
 This list of duties--which explicitly includes top level counseling of the President and the preparation of lectures, bulletins, and other informative releases on behalf of the agency--persuades us that the EQB's Director of Administration is deeply involved in policymaking, confidential, and communicative tasks at a very high level.
 
 
 33
 This case is not as clear as the two that follow because plaintiff's list of job duties tends to stress what might be considered politically neutral "administrative" functions. This is not merely a position of trust or confidence, however, but a critical top level position involving wide-ranging responsibility to counsel, represent, and serve the President of a large agency in ways as yet uncharted. Furthermore, we fail to see how one could possibly measure the performance of the person occupying this position by strictly technical or professional criteria. This combination of factors persuades us that plaintiff was not the beneficiary of a "clearly established" right protecting him from politically motivated dismissal. We therefore conclude that defendant Rohena-Betancourt is entitled to immunity from an action for damages and that the decision of the district court denying his motion for partial summary judgment must be reversed. Although our conclusion forecloses Mendez-Palou from recovering damages, we express no view as to whether the district court, after full development of the record, could still restore plaintiff to his position. Cf. De Choudens, 801 F.2d at 5.
 
 
 34
 B. Rodriguez Ramirez: Assistant Secretary for Special Services, Department of Agriculture.
 
 
 35
 Prior to his demotion, plaintiff Rodriguez Ramirez was Assistant Secretary for Special Services in Puerto Rico's Department of Agriculture, a trust or confidential position under the Puerto Rico Public Service Personnel Act. P.R.Laws Ann. tit. 3, Sec. 1350. On April 18, 1979, Rodriguez signed an official Job Classification Questionnaire prepared by COPA that described his powers and functions as an Assistant Secretary. According to this questionnaire, the Assistant Secretary for Special Services is "one of the main assistants to the Secretary of Agriculture in the directing, planning, supervision, coordination and evaluation of all of the activities carried out in [the Special Services area], under the supervision of the Secretary and/or Undersecretary." The Special Services area is comprised of subprograms relating to marketing regulations governing farming and animal husbandry products, the analysis and registry of farming products, the control of plagues in plants, and the inspection and certification of fresh and processed farming products. The Office of Tobacco Adjustment also falls within the jurisdiction of the Assistant Secretary for Special Services. Based on this list, it is apparent to us that the Assistant Secretary is primarily responsible for a number of subprograms and offices within the DOA that could involve intensely partisan political interests and concerns.
 
 
 36
 In addition, the Job Classification Questionnaire points out that the Assistant Secretary receives only general instructions and superficial supervision and that the position involves policymaking, access to confidential information, and governmental communication. Among other things, the Assistant Secretary for Special Services:
 
 
 37
 1. Directs, plans, coordinates, evaluates and supervises the activities of [the] subprograms offices [under his control].
 
 
 38
 2. Organizes and directs the technical research done in the planning, restructuring and improvements of the organization's structure of his area.
 
 
 39
 3. Counsels the Secretary of Agriculture in technical, administrative and specialized aspects that come up in the area under his supervision.
 
 
 40
 4. Prepares draft bills, resolutions, conferences, lectures, circulars, memoranda, responses to special consultations and correspondence delegated to him by the Secretary.
 
 
 41
 ...
 
 
 42
 8. Represents the Secretary of Agriculture in government meetings, public hearings, administrative hearings, or in other meetings assigned to him by the Secretary and undertakes all authority and responsibility involved in the matter.
 
 
 43
 9. Performs any other duty assigned to him by the Secretary or Undersecretary.
 
 
 44
 Furthermore, the position is classified by COPA as "Assistant Secretary II," the definition of which clearly highlights the policymaking and confidential nature of the position.[3]
 
 
 45
 Given this extensive list of duties and responsibilities, we can only conclude that Rodriguez Ramirez did not enjoy the benefit of a clearly established constitutional right protecting him from dismissal due to his support for the PNP. It was thus objectively reasonable for defendant Gonzalez-Chapel to believe that the individual occupying the post of Assistant Secretary for Special Affairs could be replaced on the basis of political affiliation. Consequently, defendant Gonzalez-Chapel was entitled to immunity from a section 1983 action for damages and the court below erred by denying his motion for partial summary judgment.
 
 
 46
 C. Gimenez Boehm: Deputy Executive Director for Special Affairs, Aqueduct and Sewer Authority.
 
 
 47
 Gimenez Boehm was the Deputy Executive Director for Special Affairs in the ASA. The ASA Board of Governors, by issuing Resolution No. 1099 on September 27, 1983, created the position "to carry out [and] conduct activities of an administrative nature by direct appointment by the Executive Director, in the different programs of the Authority." The resolution also provided that the Deputy Executive Director for Special Affairs would hold the same rank as the Deputy Executive Directors for the four specific programs conducted by the ASA: Federal Affairs, Operations, Engineering, and Administration and Finance. In short, the job formerly performed by plaintiff involved high level work in every area of a government authority expressly "created for the purpose of providing ... to the inhabitants of Puerto Rico an adequate drinking water [and] sanitary sewage service...." P.R.Laws Ann. tit. 22, Sec. 144. We therefore conclude that the occupant of the position could potentially deal with matters of partisan interest or concern on a regular basis.
 
 
 48
 The duties of the ASA's Deputy Executive Director for Special Affairs, unlike those performed by the other two plaintiffs considered in this opinion, are not described in a formal COPA Classification Questionnaire or a signed job description. Rather, the powers and functions of Gimenez Boehm's position were left vaguely defined and entirely at the discretion of the agency's Executive Director. Indeed, the resolution passed by the Board of Governors indicates that the new position replaced the former post of Special Assistant to the Executive Director, but was upgraded to attract "a person with vast knowledge in administrative phases and matters related with the rest of the programs of the Authority."
 
 
 49
 In Elrod, the Supreme Court stated that "[a]n employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position." 427 U.S. at 368, 96 S.Ct. at 2687. Furthermore, we believe that an official working in close contact with the head of a government agency is also more likely to be privy to a substantial amount of confidential information relating to the politically sensitive operations of the agency. There is further information in the record concerning Gimenez Boehm's role as spokesperson for the Executive Director and the agency, but due to the circumscribed nature of our interlocutory review we refrain from relying upon this evidence. The simple truth is that, regardless of what duties Gimenez Boehm actually performed during his tenure at ASA, the inherent power of the position of Deputy Executive Director of Special Affairs easily encompasses policymaking, communicative, and confidential tasks that could have a direct bearing on the partisan goals and policies of the agency.
 
 
 50
 In sum, Gimenez Boehm occupied a position that the ASA Board of Governors had endowed with the second highest rank in the agency and that involved close contact with the agency's Executive Director. Furthermore, the Board envisioned that the occupant of the post would work in all four operational areas of the agency, and receive assignments spanning a wide range of issues on an ad hoc basis from the Executive Director. We are therefore unable to hold that this position was among those clearly protected from patronage dismissal by Elrod, Branti, and their progeny. Instead, we must conclude that defendant Riefkohl was objectively reasonable in determining that the individual occupying the post of Deputy Executive Director for Special Affairs could be replaced on the basis of political affiliation. Accordingly, Riefkohl is entitled to immunity from a civil damage action as a matter of law and the court below erred in denying his motion for partial summary judgment.
 
 
 51
 V. Conclusion.
 
 
 52
 For the foregoing reasons, we hold that the district courts erred in denying the respective motions of defendants-appellants for partial summary judgment on the basis of qualified immunity. Accordingly, we vacate the orders and remand all three cases to the district courts with instructions to enter summary judgment for defendants on the damage claims. Despite our holding that all three defendants are immune from monetary liability, however, plaintiffs' claims for reinstatement and other injunctive relief remain to be heard.
 
 
 53
 Vacated and remanded with instructions.
 
 
 
 [1]
 Gonzalez' successor as Secretary of Agriculture is also a party to this action for the purposes of injunctive relief. Fed.R.Civ.P. 25(d)
 
 
 [2]
 Riefkohl's successor as Director of the ASA is also a party to this action for the purposes of injunctive relief. Fed.R.Civ.P. 25(d)
 
 
 [3]
 The COPA "Criteria of Classification" for Assistant Secretary II provides:
 Executive and professional work of the highest degree of responsibility and complexity, which requires the application of a wide range of knowledge in different disciplines, acting as one of the main assistants to the secretary of an executive-branch agency. The employee under this classification plans, coordinates, directs, supervises and evaluates all activities in one of the functional working areas whose nature, scope, organization, size and volume of operations are of marked variety and complexity. He actively participates in the drawing up and implementation of public policy belonging to his area of responsibility and gives counsel to the Secretary and to the Undersecretary in all areas related to his scope of work.