Pedro ROMAN MELENDEZ,
Plaintiff, Appellee,

v.

Roberto INCLAN, etc.,
Defendant, Appellant.

No. 86–1532.

United States Court of Appeals,
First Circuit.

Heard Dec. 1, 1986.

Decided Aug. 4, 1987.

Carlos Del Valle with whom Marcos A. Ramirez Irizarry, Hector Rivera Cruz, Sec-retary of Justice, and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for defend-ant, appellant.

Pedro Miranda Corrada, San Juan, P.R., with whom Hector Urgell Cuebas and Jose Roberto Feijoo, Santurce, P.R., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, COFFIN and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

This case is another in the large group of cases before this circuit concerning alleged political dismissals in Puerto Rico following the 1984 election won by the Popular Democratic Party ("PDP") over the New Progressive Party ("NPP").

Plaintiff Pedro Roman Melendez ("Roman") brought this action for declaratory and injunctive relief and back pay under 42 U.S.C. § 1983 (1982) in the United States District Court for the District of Puerto Rico against defendant Roberto Inclan ("Inclan"). Roman alleged that Inclan improperly dismissed him from the position of Regional Director of the Arecibo Region of the Puerto Rico General Services Administration ("GSA") solely because of his political affiliation with the NPP, in violation of the First and Fourteenth Amendments of the Constitution. Roman sought reinstatement, back pay and damages.

On November 22, 1985 Inclan moved for summary judgment on the grounds both that political loyalty was a proper requirement for the effective performance of Roman's office and that the damages action should be dismissed on the basis of Inclan's qualified immunity. On May 9, 1986 the district court denied this motion, 641 F.Supp. 998. After a bench trial the court on May 22, 1986, ordered reinstatement of Roman to his former position and directed Inclan to pay $12,442.60 in damages and back pay, plus interest to Roman.

I.

The district court found basically as follows:

Roman is a certified civil engineer who commenced public service in 1955. He is a member of the New Progressive Party, a fact well known by his fellow workers. In 1973, under the first administration of the present Puerto Rico Governor, Rafael Hernandez Colon, he was appointed to the position from which he was recently discharged, Regional Director for the Arecibo Region of the Puerto Rico General Services Administration.[1] In 1979 the position of regional director was classified under the new Personnel Act as one of trust ("de confianza"), meaning that under the laws of Puerto Rico its occupant serves at the pleasure of the administration. Roman occupied this office from 1973 until March 13, 1985 when he was removed by Inclan and reverted to his career position of Engineer VI. His monthly salary was accordingly reduced from $1,963 to $1,502.80.

Inclan took office as the Administrator of General Services on January 14, 1985, soon after Governor Hernandez Colon's PDP administration came to power. Inclan met on January 22, 1985 with the eight regional directors of the agency, all of whom were members of the NPP. The district court found that even though Inclan did not expressly request Roman's resignation, "the message to resign was implicit or implied."

Upon being advised that Roman expected to retire in March 1985, Inclan allowed him to continue in the position of regional director. But while Roman retained the title of regional director, Inclan appointed one Luis A. Martinez, a member of the PDP, as the acting regional director. On January 28, 1985 Martinez ordered the locks changed on Roman's office. When Inclan later learned that Roman would not be eligible for retirement until September 1986, he issued a letter demoting Roman on March 13, 1985.

From the January 22 meeting to the March 13 demotion, Roman had retained no actual authority as regional director, being allowed only to perform inspection at ongoing projects. As of the date of the trial, Martinez continued to occupy the position of regional director, notwithstanding the fact that he is not a licensed engineer, an official requirement for the position. The court found that there was no evidence that Roman was inefficient or unqualified for the regional director's job, and that Inclan's true reason for demoting Roman was the latter's political affiliation with the NPP.

The court went on to determine that political affiliation was not an appropriate requirement for the effective performance of the job of GSA regional director. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). It ruled that Roman's demotion was, therefore, unconstitutional.

In concluding that political affiliation was not an appropriate requirement for the position of GSA regional director, the district court made a number of findings concerning the functions of GSA and the nature of the regional director's position. It found that GSA is organized to operate seven programs. Plaintiff served in the program that was concerned with the maintenance and conservation of public buildings, mainly schools. The position of regional director within that program (there are eight regions, hence eight regional directors throughout Puerto Rico), was found to rank fifth in the GSA hierarchy after the administrator, the deputy administrator, the assistant director for the construction and conservation program, and the head of the technical staff.[2] The court further said that the program under which Roman worked (construction and conservation) is "largely directed from the GSA central office by the assistant administrator together

---

**1.** This was the same governor during whose subsequent administration Roman was demoted. Governor Hernandez's party is the Popular Democratic Party.

**2.** While the court found that the head of the technical staff is above the eight regional di-

rectors, the regional directors formally report directly to the assistant (or "auxiliary") director for the construction and conservation program. They therefore rank fourth in the vertical hierarchy, not fifth.

with a staff of seven engineers and two architects located at the central office." Such program is involved solely with the repairs and maintenance of public buildings, predominantly public schools. Moreover, the court found that the decision of when to build a new school is made exclusively by the Department of Education, and the actual construction of such a school is the responsibility of the Public Buildings Administration, not the GSA. The budget of the GSA is "implemented and prepared at the central office" and any projects the regional director recommends to be built in a particular school must be approved by that office. Finally, the court concluded that the only independent authority the regional director has is that of hiring brigades of temporary employees to work on repair or construction projects. However, the court added that even the pay scales of these employees were not fixed by the regional director.

The above findings and rulings preceded our decision in *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986), in which this circuit, sitting en banc, construed the standards applicable in these cases.

## II.

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Supreme Court decided that the First Amendment protects public employees who do not occupy a "policymaking" or "confidential" position from being discharged because of their political affiliation. 427 U.S. at 367, 96 S.Ct. at 2686; *id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring). Four years later, in *Branti,* pertaining to an assistant public defender's position, the Court stated that "the ultimate inquiry is ... whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the office involved." *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294.

In *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (en banc) (1st Cir.1986), this court articulated a two-part inquiry, derived from the Supreme Court's decisions, as being applicable in cases of political dismissals.

We said that the first question to be asked was "whether the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests ... [or] concerns.'" *Id.* at 241. "This step is designed to cut off from further consideration those positions involving matters devoid of partisan concerns, such as the 'proper flow of work in an agency, ... or the preferred accounting method or computer system.'" *Mendez-Palou v. Rohena-Betancourt,* 813 F.2d 1255, 1258 (1st Cir.1987). For a position to relate to partisan political interests or concerns, we said

> there need not exist presently a political disagreement over the proper role of government in the particular area of governance at issue. The position at issue need only involve "government decision-making on issues where there is room for political disagreement on goals or their implementation."

*Id.* at 1258.

Our interpretation was meant to assure that, in recognizing First Amendment protection for the vast majority of government employees, courts did not overlook "that representative government needs a certain amount of leeway for partisan selection of agents in order to work." *Jimenez Fuentes,* 807 F.2d at 241. As Judge Coffin wrote for the en banc court,

> Appropriateness [of party affiliation] is, we think, a corollary to our system of determining the direction of governmental entities by the popular election of top office holders who have taken or are considered to have taken positions on one or more issues during a campaign. In order for the new administration to be given an opportunity to fulfill expectations, it must have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance. The presence of such per-

sons advances the goals of representative government; their absence, in *Elrod's* term, "undercut[s]" such government. 427 U.S. at 367, 96 S.Ct. at 2687. *Id.*

If the first inquiry—directed to whether the position relates to partisan political interests or concerns—is answered affirmatively, a court must next "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Jimenez Fuentes*, 807 F.2d at 242. For this second inquiry, the court focuses upon the "powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Id.*

### A.

Moving to the first part of the above inquiry, we ask whether the court below was correct in determining that Roman's position did not relate to partisan political interests or concerns as that term was elucidated in *Jimenez Fuentes*. While the question is close, we believe the court erred.

Roman is one of eight regional directors of GSA's building construction and conservation program, a program which employs around 70 percent of GSA's employees and consumes around 60 percent of its budget. Within his geographical region, Roman oversees the repair, maintenance and improvements of all public schools and certain other public buildings (schools being the main part of GSA's concerns). His duties are analogous, in general character, to those of the unsuccessful plaintiff in *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985).

In that case the Seventh Circuit held that Tomczak, the First Deputy Commissioner of the Department of Water of the City of Chicago, could be dismissed for political reasons. The court of appeals accepted the district court's finding that Tomczak's position " 'included the responsibility for all Bureau of Water activities as they relate to the operation, maintenance, repair, and new construction of the water distribution system....' " *Tomczak*, 765 F.2d at 639. The district court in *Tomczak* had held that these areas of governance were not "political," as they were not ones in which there could be principled disagreements about goals or their implementation. The Seventh Circuit reversed, stating that the district court had an "unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services." *Id.* at 641. The court went on to say,

Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services. While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal.

*Id.*

Much the same rationale applies to the case before us. Just as the distribution of the water supply is of vital concern to the electorate, so too is the physical condition of the public schools. And there "is clearly room for principled disagreement in the development and implementation of plans to achieve" the ultimate goals of the program. *Id.* Indeed, the physical condition of schools could be an issue of special political significance for the incumbent governor and his administration because of its close relationship to the undoubtedly partisan issue of education in public schools. Defendant Inclan testified that he believed there was a relationship between the physical condition of school buildings and the education children receive in Puerto Rico. Certainly if the schools are in disrepair, many voters are likely to be upset and to blame the party in power for its policies or lack of policies in this area.

Thus we think the purposes served by this particular GSA program impinge upon partisan concerns. We also believe the record establishes that the regional director's position in the program so relates.

Looking at the Classification Questionnaire (*see* Appendix), which lists the official duties of the regional director, and at the testimony at trial, it appears that the regional director acts as a key facilitator of the agency's program in his region and, in so doing, handles issues where there is room for partisan disagreement.

The questionnaire provides that the regional director "[c]oordinates with the school superintendents and agency heads in his region the priorities to be established in the planning of construction and improvement programs for the schools and non-school buildings." Political parties may disagree as to the degree of attention they are going to give to the physical conditions of public buildings. They may also disagree as to which buildings need immediate or special care. Furthermore, they may disagree whether to give priorities to rural or urban schools.

The questionnaire states that the regional director "[o]rders investigations on complaints and requests and takes action as required by said investigation." Roman himself testified that the regional director takes complaints about the physical needs of the schools from committees composed of parents and teachers, from the different mayors, and even from the Governor's office. He added that if the problem can be taken care of with the resources available to the regional director, then action is taken at the regional level. However, if the problem requires additional resources the regional director prepares a report "explaining the magnitude of the problem, the manner in which the situation affects public interest and the resources that are needed in order to solve it." We believe that the regional director's political affiliation could reasonably affect the manner in which he responds to these complaints and acts upon them. The political parties might hold different policies about the way to proceed in those cases that depend on their different views of the role of government.

From all the above, we find that the first inquiry in the *Jimenez Fuentes* test, namely that the position at issue relate to partisan political interests or concerns, is satisfied in this case.

### B.

We next ask under the inquiry formulated in *Jimenez Fuentes* whether the regional director's position resembles a policymaker (or some other status where party affiliation might be thought an appropriate requirement). We observe that in every case concerning regional directors of government agencies in Puerto Rico, we have concluded, at least for purposes of granting qualified immunity, that a regional director was, in fact, a policymaker. *See Echevarria v. Gracia-Anselmi,* 823 F.2d 696 (1st Cir.1987) (regional director of the Right to Employment Administration); *Perez Quintana v. Gracia Anselmi,* 817 F.2d 891 (1st Cir.1987) (regional director of the Right to Employment Administration); *Rafucci Alvarado v. Zayas,* 816 F.2d 818 (1st Cir.1987) (regional director of the Department of Social Services); *Alicea Rosado v. Zayas,* 813 F.2d 1263 (1st Cir.1987) (regional director of the Department of Social Services); *Monge Vazquez v. Rohena Betancourt,* 813 F.2d 22 (1st Cir.1987) (regional director of the Department of Natural Resources); *Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258 (1st Cir.1987) (regional director of the Rural Housing Administration); *Rodriguez v. Munoz,* 808 F.2d 138 (1st Cir.1986) (regional director of the Right to Employment Administration); *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986) (regional directors of the Urban Renewal and Housing Corporation).

The Classification Questionnaire indicates that the position of regional director of the GSA involves policymaking. The introduction to the questionnaire states that a regional director's "responsibility includes the supervision, coordination and evaluation of all the work done in the office, applying *with broad independence* the public policy of the agency in the development of the work program." (Emphasis added.) The list of duties on the questionnaire also reflects the policymaking nature of the position:

1. Coordinates *with the school superintendents and agency heads in his region the priorities* to be established in the planning of construction and improvement programs for schools and non-school buildings.

2. *Develops* the conservation and improvements programs pursuant to the priorities established.

3. *Procures the necessary funds* for the execution of the programs.

....

5. *Is responsible* to the administrator for *the development of construction project studies* in his region, ... making sure that they follow the public policy established.

6. *Directs* and *supervises* the drafting of the budget for the execution of improvement projects in school and non-school buildings.

7. *Orders investigations* on complaints and requests and takes action as required by said investigation.

....

13. ... Is also responsible for the *drafting* of the annual report and *budgetary estimate for his region.*

....

16. Advises the administrator on the enactment of the agency's public policy and applies it to the administration of his region with *broad discretion.*

....

(Emphasis added.)

The testimony offered at trial confirmed the fact that these are part of the duties of the regional director of the GSA. The evidence also revealed that the regional director is fourth in the hierarchy of the GSA, that he supervises around 80 regular employees and up to 400 irregular ones, that he is one of the 28 employees who are classified as "trust" employees under the public service system out of at least 3,000 in the GSA, and that the construction and conservation program (as already noted) employs around 70 percent of the GSA employees and consumes around 60 percent of its budget. These facts demonstrate that the position of regional director of the construction and conservation program is a significant one within the GSA.

We conclude that the position of regional director of the GSA (1) relates to partisan political interests or concerns and, (2) is a policymaking one. Therefore, it is one for which political affiliation may be required.

*The judgment of the district court is vacated. The case is remanded with directions to the district court to dismiss the complaint. Costs to appellant.*

### APPENDIX

Duties of the Position of Regional Director for the Construction and Conservation Program of the General Services Administration of the Commonwealth of Puerto Rico

Is responsible to the General Services Administrator for the administration of the Manati Regional Office. Said responsibility includes the supervision, coordination and evaluation of all the work done in the Office, applying with broad independence the public policy of the agency in the development of the work program. Among others, his most relevant duties are:

1. Coordinates with the School Superintendents and agency heads in his region the priorities to be established in the planning of conservation and improvement programs for school and non-school buildings.

2. Develops the conservation and improvements programs pursuant to the priorities established.

3. Procures the necessary funds for the execution of the programs.

4. Administers the budget and finances of his region within the policy established by the Administrator.

5. Is responsible to the Administrator for the development of construction project studies in his region, for which he offers professional guidance required, making sure that they follow the public policy established.

6. Directs and supervises the drafting of the budget for the execution of improvement projects in school and non-school buildings.

7. Orders investigations on complaints and requests and takes action as required by said investigations.

8. Inspects the execution of the construction work that are carried out making sure that they are in agreement with the drawings and their specifications.

9. Revises the structural design analysis that is prepared prior to the construction of complex work. Inspects buildings with apparent structural failures in order to give the necessary orders for their correction.

10. Contracts, as delegated by the Administrator, permanent improvement projects whose cost does not exceed the amount of $25,000.00.

11. Supervises the preparation of the designs of sewer waters disposal systems, electrical systems, etc., in the constructions.

12. Recruits and selects personnel for the conservation and improvements brigades. Assigns their salaries and wages, applies disciplinary sanctions and makes decisions in regards to their retention pursuant to the rules and regulations established.

13. Collaborates significantly in the drafting of the Four Year Report that is submitted every year to the Planning Board, regarding the improvements to school and non-school buildings. Is also responsible for the drafting of the annual report and the budgetary estimate for his region.

14. Revises every month the status report of the projects in his region that serves as a resource to draft the Monthly Report to the Governor.

15. Sees that the strictest security measures established by the laws and regulations in effect are applied in his region.

16. Advises the Administrator on the enactment of the agency's public policy and applies it to the administration of his region with broad discretion.

17. Represents the Administrator at professional activities and ceremonial acts held in his region requiring his presence.

18. Carries out any other related duty assigned by the Administrator.