# United States Court of Appeals
## For the First Circuit

No. 07-1976

SAMUEL LÓPEZ-QUIÑONES; IRIS GRISEL NIEVES-HERNÁNDEZ;
CONJUGAL PARTNERSHIP LÓPEZ-NIEVES,

Plaintiffs, Appellees,

v.

PUERTO RICO NATIONAL GUARD; COMMONWEALTH OF PUERTO RICO;
WILLIAM VÁZQUEZ-IRIZARRY, In his official Capacity as Secretary of
Justice of the Commonwealth of Puerto Rico; MILAGROS MORENO-RAMOS;
CONJUGAL PARTNERSHIP COLÓN-MORENO; JOE DOE; CONJUGAL PARTNERSHIP
DOE-BURGOS; JOHN DOE; CONJUGAL PARTNERSHIP DOE-APONTE; ARTURO
DÁVILA; CONJUGAL PARTNERSHIP DÁVILA-MARTÍNEZ; SARA DOE; CONJUGAL
PARTNERSHIP REYES-DOE; ABC INSURANCE COMPANY; CONJUGAL PARTNERSHIP
MÁRQUEZ-DOE; CONJUGAL PARTNERSHIP SANTIAGO-DOE; MRS. SANTIAGO,

Defendants,

FRANCISCO A. MÁRQUEZ-HADDOCK, JUAN E. COLÓN-GARCÍA; JOSEFA BURGOS-
REYES; EVA APONTE-MARICHAL; MARIMIR MARTÍNEZ-MORALES; NELSON REYES-
AVILÉS; SAMUEL SANTIAGO-RAMÍREZ,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella, Circuit Judge,

and Selya, Senior Circuit Judge.

Jorge Martínez-Luciano with whom William O'Connor was on brief for defendants, appellants.

Efraín Maceira-Ortiz for appellees.

May 21, 2008

**BOUDIN**, **Chief Judge**.  Samuel Lopez-Quinones--a former official of the Puerto Rico National Guard--claims he was terminated from that position on account of his political affiliation.  He sued the Commonwealth of Puerto Rico, the Puerto Rico National Guard, and various officials, seeking relief primarily under 42 U.S.C. § 1983 (2000).  This interlocutory appeal presents only the question whether the individual defendants are entitled to qualified immunity from Lopez' damage claims.

Lopez was hired as director of the general services section of the Puerto Rico National Guard in 1997.  In the 2000 elections, the Popular Democratic Party ("PDP") defeated the New Progressive Party ("NPP").  Lopez--a known supporter of the NPP--claims that after the election, he was gradually stripped of his professional duties.  In July 2004, disciplinary proceedings were instituted against him within the National Guard.

Lopez then filed suit in federal district court in Puerto Rico, seeking injunctive and monetary relief.  In July 2005, while his suit was pending, Lopez was terminated.  He sought preliminary injunctive relief ordering his reinstatement and amended his complaint to reflect the fact of his termination.  In October 2006, the district court denied Lopez' request for preliminary injunctive relief.

Shortly thereafter, the individual defendants moved for a ruling on their previously asserted defense of qualified immunity.

-3-

They urged that Lopez' position was not protected from political patronage firings under the Elrod/Branti line of cases, see Elrod v. Burns, 427 U.S. 347 (1976); Branti v. Finkel, 445 U.S. 507 (1980), and that in any event, defendants were entitled to qualified immunity because any such protection was not clearly established at the time of Lopez' termination.

The district court denied the motion, and defendants filed this interlocutory appeal. Although the district court's order is not a final disposition of the case, we have jurisdiction to the extent defendants seek review of the district court's denial of their qualified immunity defense, Torres v. Puerto Rico, 485 F.3d 5, 8-9 (1st Cir. 2007), but only so far as it rests on a legal ruling rather than a factual dispute. Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 60 (1st Cir. 2004). As to the legal questions, our review is de novo. Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004).

The qualified immunity defense depends on whether the nature of Lopez' position was such that defendants were entitled to consider his political affiliation as a job qualification and, even if they were not, whether a reasonable officer at the time would have understood patronage dismissal to be barred. See Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004). Analytically, the second question may often be answered without resolving the first, but in accordance with Saucier's preferred approach, we generally--although not always-

-4-

-answer the questions in sequence.  <u>Saucier</u> v. <u>Katz</u>, 533 U.S. 194, 201 (2001).

In <u>Elrod</u>, the Supreme Court announced a new rule rendering patronage firings a violation of the First Amendment save where political affiliation is an appropriate qualification for the particular position.  <u>Elrod</u>, 427 U.S. at 367-68; <u>Branti</u>, 445 U.S. at 518.  Yet, as we said in <u>Flynn</u> v. <u>City of Boston</u>, 140 F.3d 42, 44 (1st Cir.), <u>cert. denied</u>, 525 U.S. 961 (1998), doctrine in this area remains

> largely a porridge of general statements and variables: positions are less likely to be protected to the extent that they are "higher," more "political," more "confidential," and so on; duties prevail over titles; everything depends on circumstances.

Our decisions have asked whether a position's functions are those of "a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement."  <u>Jimenez Fuentes</u> v. <u>Torres Gaztambide</u>, 807 F.2d 236, 242 (1st Cir. 1986) (en banc), <u>cert. denied</u>, 481 U.S. 1014 (1987); <u>see also</u> <u>Flynn</u>, 140 F.3d at 45.  "Actual functions of the job, not titles, control, and an official description of job functions is a presumptively reliable basis for determining those functions."  <u>Olmeda</u> v. <u>Ortiz-Quinonez</u>, 434 F.3d 62, 66 (1st Cir. 2006) (citation omitted).

We also consider the position's "relative pay" and whether it entails "technical competence, power to control others, authority

-5-

to speak in the name of policymakers, public perception, contact with elected officials and responsiveness to partisan politics and political leaders." Mendez-Palou v. Rohena-Betancourt, 813 F.2d 1255, 1259 (1st Cir. 1987). Under the case law, the classification of a position as "career" (rather than "trust") under Puerto Rico law is relevant, although not dispositive. Roldan-Plumey v. Cerezo-Suarez, 115 F.3d 58, 64-65 (1st Cir. 1997).

As director of the general services section, Lopez headed the unit of the Guard responsible for inventory (not including military equipment), utilities, property maintenance and related functions. He supervised approximately thirty other employees. Both are factors tending to indicate that one's position involves discretionary judgments, which in turn often entail policymaking. See Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 132 (1st Cir. 2005). He earned just over $30,000 per year and his job classification form said that review of his work was "superficial" (as opposed to "thorough").

On the other hand, Lopez' position was classified as a "career" position under Puerto Rico law and a closer look at his detailed job description suggests that he had modest, if any, involvement in policymaking. True, the first listed responsibility is spacious ("Plans, coordinates and supervises the activities of the general services section relating to maintenance, property, purchasing, transportation, reproduction, inventory, receiving

-6-

equipment, leasing of establishments and general services"), but almost all of the specifics are routine and fairly pedestrian. They include (merely as examples) responsibility for:

> hiring air-conditioning and radio maintenance services, radios, fumigation, cleaning and others, whether with federal or state funds;

> matters relating to the telephone service (switchboard) and state transportation (regulations, use, etc.);

> seeing that the agency is provided with [utility] service of water, electricity and telephone;

> supervis[ing] the work of employees working in the state warehouse, their purchasing, inventories, etc.;

> oversee[ing] proper filling in of purchasing logs and controls and control of existing property;

> revis[ing] and coordinat[ing] matters relating to the maintenance and cleaning of the agency; and

> [supervising] employee training in the computer and programming system.

In addition, a number of the functions involve reporting and other paperwork matters; most look mechanical (e.g., "responsible for seeing that all contracts are filed with the P.R. Comptroller's Office pursuant to provisions"), although a few could--but not necessarily would--involve policy judgments depending on the precise role Lopez actually played in the process (e.g., "supervises bids carried out in the section's purchasing area").

-7-

So far as appears, Lopez' job did not involve advising any senior officials on policy matters. He did not operate as a spokesperson or otherwise liaise with the public or other government agencies, except in ways largely ministerial. His job does not appear to have entailed discretionary judgments involving the implementation of policy, broadly understood. As to bid supervision, the district court found that Puerto Rico law largely divested Lopez of discretion in handling bids of significant size.

Lopez did supervise approximately thirty other employees, but they were mostly janitors and other lower-level employees. It is hard to see how Lopez' position implicates significant policy issues, let alone "partisan political interests . . . [or] concerns," Branti, 445 U.S. at 519, nor does he appear to be one of those mid- or upper-level officials or employees who are "significantly connected to policy-making." Flynn, 140 F.3d at 45.

Although Lopez reported directly to a political appointee, defendants have failed to identify policy decisions in which Lopez was directly involved or over which he had influence. Their main argument is that the Puerto Rico National Guard is involved in operations--such as law enforcement and natural disaster relief--that involve policymaking and implicate partisan concerns; that as director of general services Lopez was involved in procuring and maintaining the Guard's inventory and property; and that because a proper supply chain is critical to any successful operation, Lopez

was well positioned to frustrate any programs or operations with which he disagreed.

This argument proves too much. Any malfunctioning cog can jam the gears. An ability to undermine operations through incompetence or malfeasance does not mean the actor engaged in policymaking or was a confidante or spokesman for policymakers. Hadfield v. McDonough, 407 F.3d 11, 18 n.4 (1st Cir.), cert. denied, 546 U.S. 961 (2005). On "the spectrum between policymaker and clerk," Mendez-Palou, 813 F.2d at 1259, Lopez was closer to the latter and is, at least on the present record, protected under Elrod. Whether his termination was in fact politically motivated is a quite different question.

Still remaining is the question whether his status was clearly established at the time of his termination. Of course, the abstract right of a non-policy-related employee to be free from politically motivated termination dates from Elrod and Branti; but this is not enough to defeat qualified immunity. The purpose of qualified immunity is to protect reasonable, if mistaken, decision making by government officials, Jordan v. Carter, 428 F.3d 67, 71 (1st Cir. 2005), and it does not matter whether the mistake is related to broad principle or specific application.

The crucial question here is whether a reasonable official acting at the time of Lopez' termination should have known on what side of the Elrod/Branti line Lopez' own position fell. Mendez-Palou,

813 F.2d at 1259. Largely for prudential reasons, the test is not subjective but asks what a reasonable official would have thought. Pagan v. Calderon, 448 F.3d 16, 31 (1st Cir. 2006). On the present facts, this is a close call but the issue is treated as one of law, Ruiz-Casillas, 415 F.3d at 131; and, in disagreement with the able district judge, we believe that as the law stood when the decision was made a reasonable official could (albeit mistakenly) have deemed Lopez outside Elrod/Branti's protection.

As already explained, a few features of Lopez' position in combination might have led reasonable superiors of Lopez involved in the termination decision to believe he was subject to patronage dismissal: for example, that he headed the unit in question, that some of his duties were broadly phrased (even if seemingly less impressive in practice), that he was fairly well paid and his position lightly supervised, that he reported directly to a political appointee and that he supervised thirty other employees.

Defendants also point to two prior First Circuit opinions in which we held that the Personnel and General Services Officer in the Ombudsman's Office and the Regional Director of the Puerto Rico General Services Administration were subject to political dismissal. See Duriex-Gauthier v. Lopez-Nieves, 274 F.3d 4 (1st Cir. 2001); Roman Melendez v. Inclan, 826 F.2d 130 (1st Cir. 1987). Both cases are distinguishable because the jobs were classified as "trust" positions, and involved supervision of large numbers of employees,

discretionary provision of government services, and/or representation of the agency before the public and other agencies.

But, weighing in defendants' favor, the job titles are similar, and in Roman Melendez we noted that "in every case concerning regional directors of government agencies in Puerto Rico, we have concluded, at least for purposes of qualified immunity, that a regional director was, in fact, a policymaker." 826 F.2d at 134. Those reading our past decisions like Duriex-Gauthier could reasonably have believed that in general, middle managers with impressive sounding titles and duties were generally outside the protected category.

The district court's own contrary decision rests significantly on a possible ambiguity in our own case law, which we now repair. Some of our precedents may suggest that even if an official has significant policymaking responsibility, he is still protected unless it is also established that the policy judgments are those for which "partisan" political motivations or judgments are appropriate, e.g., Jimenez Fuentes, 807 F.2d at 241-42; by contrast, other language from our case law indicates that involvement in policy or matters implicating political disagreement is sufficient. E.g., Flynn, 140 F.3d at 46; see also Tomczak v. City of Chicago, 765 F.2d 633, 641 (7th Cir. 1985).

It is conceivable that there are rare cases where the distinction might matter--say, a high official whose duties were

-11-

nonetheless entirely technical.  Jimenez Fuentes, 807 F.2d at 240. But for the most part policymaking is in the nature of things the basis for preserving the right of the democratic political process to operate; civil service protections can be afforded by statute but the Constitution does not require them.  The reference to "partisan" politics comes from Branti but it is far from clear that it comprised a separate test.  445 U.S. at 519.

And for his part, plaintiff has not cited any analogous First Circuit cases that would have put defendants on notice of jeopardy.  Given past precedent, we cannot say it was clearly established that Lopez, a director of a significant unit within the Puerto Rico National Guard, was insulated from political dismissal. Accordingly, while Lopez may seek injunctive relief for his termination, he may not obtain monetary relief from the individual defendants in their personal capacities.

The order denying qualified immunity is vacated and the matter remanded for further proceedings consistent with this decision.  The damage claims against the individual defendants in their personal capacities are barred but the suit may otherwise proceed.  All parties will bear their own costs.

It is so ordered.


**--Concurring and Dissenting Opinion Follows--**

**TORRUELLA**, <u>Circuit Judge</u> **(Concurring in part, Dissenting in part)**.  Since 1976, the United States Supreme Court has held that the First Amendment forbids the discharge of "public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved."  <u>Rutan</u> v. <u>Republican Party of Ill.</u>, 497 U.S. 62, 64 (1990) (citing <u>Elrod</u> v. <u>Burns</u>, 427 U.S. 347 (1976) and <u>Branti</u> v. <u>Finkel</u>, 445 U.S. 507 (1980)).  That inquiry -- whether political affiliation is a valid requirement of the job in question -- is the necessary starting point for political discharge cases.  <u>Limone</u> v. <u>Condon</u>, 372 F.3d 39, 44 (1st Cir. 2004).

This circuit leads the nation as one of the most prolific generators of political discrimination cases; in this area of litigation, the District of Puerto Rico has the dubious distinction of being the most fecund district in the circuit.  <u>See</u> <u>Morales-Santiago</u> v. <u>Hernández-Pérez</u>, 488 F.3d 465, 466 (1st Cir. 2007) ("[I]n Puerto Rico, a change between the Popular Democratic Party (PDP) and the New Progressive Party (NPP) [gives rise to] overly zealous political operatives of the prevailing party terminat[ing], demot[ing], or reduc[ing] the salaries of employees affiliated with the outgoing opposition party.").  As a result of the proliferation of these cases and their public notoriety, the legal precepts established by them are widely known in Puerto Rico, particularly by those in public administration.  It is, therefore, inconceivable in

-13-

this day and age that a reasonable public official would by-pass an inquest into whether a position in a government agency requires political affiliation before taking the drastic action of firing an employee based on party affiliation. Considering the state of the law, one who fails to do so can hardly be classified as a <u>reasonable</u> public official.

Any reasonable public official conducting such an inquiry would have concluded that López-Quiñones's position was not one requiring political affiliation. Indeed, by following the long-established case law in this circuit, the majority properly reaches the conclusion that López-Quiñones's non-policy related position was protected from political patronage dismissal. Slip op. at 9 ("On the spectrum between policymaker and clerk, López[-Quiñones] was closer to the latter and is, at least on the present record, protected under <u>Elrod</u>.") (internal quotation marks and citation omitted).

In reaching this conclusion, the majority begins its analysis with López-Quiñones's detailed job description. <u>See</u> slip op. at 5. Based on the job description, the majority finds that: (1) López-Quiñones was holding a "career" position under Puerto Rico law, <u>id.</u> at 6; (2) "almost all of the specific[] [tasks were] routine and fairly pedestrian," <u>id.</u> at 7; (3) his reporting and paperwork duties "most[ly] look mechanical," <u>id.</u>; (4) he was "not involve[d in] advising any senior officials in policy matters," <u>id.</u> at 8; (5) he "did not operate as a spokesperson or otherwise liaise with the

-14-

public or other government agencies, except in ways largely ministerial," id.; (6) he did not have "discretionary judgment[] involving the implementation of policy, broadly speaking," id.; and (7) he supervised "mostly janitors and other low-level employees." Id. Significantly, citing to both Branti, 445 U.S. at 519, and to Flynn v. City of Boston, 140 F.3d 42, 45 (1st Cir. 1998), the majority states that "[i]t is hard to see how López[-Quiñones's] position implicates significant policy issues, let alone 'partisan political interests . . . [or] concerns,' . . . nor does he appear to be one of those mid- or upper-level officials or employees who are 'significantly connected to policy-making.'" Slip op. at 8. On these facts, the majority concludes that López-Quiñones's position was not subject to patronage dismissal. I am in full agreement.

It is in the granting of immunity that I part company with my learned colleagues. Under our qualified immunity law, after finding that a constitutional right was violated, we turn to whether the law was clearly established at the time of the violation and whether a reasonable public officer would have understood that he was violating that right. See Sueiro Vázquez v. Torregrosa de la Rosa, 494 F.3d 227, 234 (1st Cir. 2007). I disagree with the majority's conclusion that "as the law stood . . . a reasonable official could (albeit mistakenly) have deemed López[-Quiñones] outside Elrod/Branti's protection." Slip op. 10. As made evident by the majority's own application of our clearly established law, López-

-15-

Quiñones's position was not subject to patronage dismissal. In deciding to terminate López-Quiñones from his position, the officials in this case recklessly ignored the established law of this circuit. Such behavior should lead to the dispossession of the mantle of qualified immunity, rather than the extension of this privilege to them.

The majority is able to conclude that the appellants are entitled to immunity because it gives undue weight to the fact that López-Quiñones's "job title [is] similar" to two prior cases "concerning regional directors of government agencies in Puerto Rico." Id. at 11 (citing Duriex-Gauthier v. López-Nieves, 274 F.3d 4 (1st Cir. 2001) and Román Meléndez v. Inclán, 826 F.2d 130 (1st Cir. 1987)). In so doing, the majority violates those very principles to which it claims adherence only a few pages earlier. As we have warned, the inquiry into the legitimacy of political patronage requires an inquiry that goes beneath the mere title of the position. See, e.g., Olmeda v. Ortiz-Quiñonez, 434 F.3d 62, 66 (1st Cir. 2006) ("Actual functions of the job, not titles, control, and an official description of job functions is a presumptively reliable basis for determining those functions." (internal citations omitted)); Flynn, 140 F.3d at 44 (noting that "duties prevail over titles"). Unfortunately, it appears that the majority's invocation of this principle was mere lip service; in its grant of immunity, the

majority inexplicably applies an entirely different and contradictory standard.

Even if the job titles in <u>Duriex-Gauthier</u> and <u>Román Meléndez</u> are similar to that of López-Quiñones, the employees' actual responsibilities are substantially different. The employees in <u>Duriex-Gauthier</u> and <u>Román Meléndez</u> held "trust positions;" exercised meaningful supervision of a large number of employees; enjoyed discretion over the particular government services under their aegis; and represented their respective agencies before the public and other government entities. <u>Duriex-Gauthier</u>, 274 F.3d at 7-8, 10; <u>Román Meléndez</u>, 826 F.2d at 134-35. In contrast, none of those prerogatives or powers are present here.

Most importantly, unlike the employees in <u>Duriex-Gauthier</u> and <u>Román Meléndez</u>, López-Quiñones was not involved in making or recommending any agency policy. There is nothing in the record to support a finding that López-Quiñones was a policymaker. The majority opinion describes him as having only "modest, if any, involvement in policymaking," slip op. at 6, and even the appellants "failed to identify policy decisions in which López[-Quiñones] was directly involved or over which he had influence." <u>Id.</u> at 8. Policymaking is the key function in requiring that the employee be required to belong to the political party in power. <u>See</u> <u>Elrod</u>, 427 U.S. at 367 (holding that under the First Amendment "patronage dismissals" must be restricted to "policymaking positions").

-17-

As stated by the majority at the outset of its opinion: "Our decisions . . . ask[] whether a position's functions are those of 'a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." Slip op. at 5 (quoting Jiménez Fuentes v. Torres Gaztambide, 807 F.2d 236, 242 (1st Cir. 1986) (en banc)). López-Quiñones's job functions do not fall into any of those categories. He was essentially a foreman over a group of janitors and similar employees; membership in a particular political party was not a requirement of his job. It is truly difficult to believe that this was not known or easily discoverable by the appellants after applying our established jurisprudence in this area. After professing to apply our clear and established precedent regarding patronage dismissals, the majority makes an about-face and inexplicably relies on López-Quiñones's job title rather than on his responsibilities or functions. See id. at 11. Far from clarifying the law, the majority muddles it and, in the process, gives a free ride to government officials who are not entitled to or deserving of such exceptional treatment.

I dissent to the granting of qualified immunity to these officials.