Luis J. GONZALEZ–GONZALEZ, Plaintiff, Appellee,

v.

Carmen Sonia ZAYAS, etc., Defendant, Appellant.

No. 87–1863.

United States Court of Appeals, First Circuit.

May 5, 1988.

Carlos Del Valle, Hato Rey, P.R., with whom Hector Rivera Cruz, Secretary of Justice, Rafael Ortiz Carrion, Sol. Gen., Marcos A. Ramirez Irizarry and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for defendant-appellant.

Pedro Miranda Corrada, San Juan, P.R., with whom Hector Urgell Cuebas, was on brief, for plaintiff-appellee.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and CAFFREY,* Senior District Judge.

CAFFREY, Senior District Judge.

Before the Court is yet another controversy arising from the aftermath of the gubernatorial election of 1984 in the Commonwealth of Puerto Rico. In that election, the Partido Popular Democratico

---

* Of the District of Massachusetts, sitting by designation.

(PPD) ousted the incumbent Partido Nuevo Progresista (PNP). In the wake of that ouster, scores of government employees, including appellee Gonzalez, were demoted or dismissed from their positions. Not surprisingly, many of those employees were members of the defeated PNP.

The appellee in this case, Luis J. Gonzalez–Gonzalez, is the former Director of the Board of Appeals for the Department of Social Services for the Commonwealth. In his complaint, he alleges that the appellant, the Secretary of Social Services, demoted him to a subordinate position solely because of his party affiliation, in violation of his rights under the First and Fourteenth Amendments. His prayer for relief requests reinstatement to his former position, damages and back pay.

The Secretary moved for summary judgment, asserting that her action in demoting Gonzalez was protected under the doctrine of qualified immunity. The District Court denied the motion, ruling that the Secretary was not entitled to qualified immunity from damages, 671 F.Supp. 106. The District Court analogized the functions inherent to the office of the Director of the Board of Appeals to the functions performed by the chief judge of an appellate court. Because of the quasi-judicial nature of the Director's functions, the court ruled that it was clearly established at the time of the Secretary's action that a patronage demotion would violate the constitutional rights of the appellee. The Secretary appealed. We affirm.

It is black letter law that a public official is entitled to immunity from personal liability for damages caused by her official actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The shield provided by the immunity doctrine promotes the freedom of action that is essential to the effective execution of an official's public trust. A public official would naturally hesitate to act if exposed to liability for all damages inadvertently caused by her actions, even if substantial public benefit would also result. The immunity doctrine thus developed in recognition of the reality that sometimes

an individual's interest in compensation must give way to the greater interest of the public. *See generally Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

The immunity afforded public officials does not protect them from liability for damages in every instance. A public official is not shielded when she knows or should reasonably know her conduct violates the legal rights of third persons. *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738. No bright line test exists for determining when an official is or is not entitled to immunity. The question to be addressed in every case is whether the plaintiff's legal right was clearly established at the time of the challenged official action.

In political discharge cases, some difficulty is presented in determining whether a public official has violated a clearly established right of the plaintiff. While generally the Constitution forbids the dismissal of a government employee for reasons based solely on the employee's party affiliation, *Elrod v. Burns*, 427 U.S. 347, 360, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976), in an exception carved out in *Branti v. Finkel*, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980), the Supreme Court recognized that party affiliation is an appropriate requirement for certain categories of government employment. Therefore, persons holding these positions are not constitutionally protected from patronage dismissal or demotion. The contours of the *Branti* exception are ill-defined, making it difficult to determine whether an employee in a particular government position is or is not protected from political discharge. For this reason, this Court has been somewhat lenient in allowing public officials to claim qualified immunity in the patronage dismissal cases. *See, e.g., Mendez–Palou v. Rohena–Betancourt*, 813 F.2d 1255 (1st Cir.1987); *DeAbadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir. 1986).

Despite the relative confusion in the area, however, public officials do not have free rein to discharge employees for politi-

cal reasons under the guise that the law was not clearly established as to particular positions. Thus, where a particular position involves purely technical or non-discretionary skills or for other reasons it is obvious that party affiliation is not an appropriate requirement for a particular government job, a public official is not protected by qualified immunity.

This Court believes that the Directorship of the Board of Appeals is such a position. As described in the OP–16 Job Classification Form, the Board of Appeals is entrusted with the function of guaranteeing the rights of the appellants to air their grievances with lower level administrative decisions before an impartial body. The Board is therefore required to be neutral by the very nature of its function. This requirement of impartiality extends to the Director of the Board who analyzes all appeals and makes or participates in all final decisions regarding appeals before the Board. Needless to say, conditioning the Director's continued employment on his party affiliation would be antithetical to the requirement that he perform his decision-making in an impartial manner.

The Secretary places great emphasis on other functions performed by the Director which she characterizes as policy-making. In essence, the Secretary asserts that the Director's other activities "potentially concerned matters of partisan political interest and involved at least a modicum of policy-making responsibility, access to confidential information or official communication ..." sufficient to entitle the Secretary to the protection of qualified immunity. *Mendez–Palou v. Rohena–Betancourt*, 813 F.2d at 1259.

Even assuming the Director's position does entail some policy-making, we believe that the Secretary's position misconstrues the holding in *Mendez–Palou*. Although that case held that it was not clearly established law in 1985 that positions involving a "modicum of policy-making" were protected from political dismissal, the Court did not go so far as to hold that the presence of some policy-making in a particular job would automatically determine that an offi-

cial is entitled to qualified immunity. Prior to *Mendez–Palou*, the Supreme Court had noted in *Branti* that not every position involving policy-making is fair game for a political discharge. 445 U.S. at 518, 100 S.Ct. at 1294–95. More importantly, in the determination of whether qualified immunity applies, the proper focus is on whether the plaintiff's right to continued employment was clearly established, not on whether the job involves policy-making. Under *Mendez–Palou*, a policy-making function is merely one indication that the plaintiff's right was probably not clearly established, given the confusion that existed in the area of political discharges of middle-level government employees.

In the present case, we believe it was clearly established that political affiliation is not an appropriate requirement when the position at issue requires impartiality and independence, despite the presence of some policy-making function. First, in *Branti*, the Supreme Court had decided that political affiliation was not an appropriate condition for the continued employment of an assistant public defender. 445 U.S. at 519. That position required that the employee have the ability to act independently of the government in representing his client's interests. The court reasoned that "it would undermine, rather than promote, the effective performance of an assistant public defender's office to make his tenure dependent on his allegiance to the dominant political party." *Id.* at 519–20, 100 S.Ct. at 1295–96. We find this reasoning to be applicable here where effective performance of the Director's duties requires impartiality. We also note that *Branti* was existing precedent at the time the Secretary demoted appellee. However, even without *Branti*, we believe that the Secretary is obligated to respect common sense in determining the extent of her authority to make patronage dismissals. Common sense dictates that impartiality is destroyed when an employee is threatened with discharge because his political beliefs differ from those holding the power to terminate his employment. Under the circumstances, the Secretary cannot claim unfair surprise

in discovering she is not protected by the qualified immunity doctrine.

The Secretary has also attacked the District Court's decision on the grounds that, in her view, the District Court erroneously confused the immunity issue with the merits of the plaintiff's claim that the Director of the Board of Appeals could not be demoted legally on the basis of his political persuasion. Although our disposition of this matter implicitly rejects this contention, we note that it is not surprising that the District Court's analysis, as well as our own, may be perceived as a decision on the merits of the claim rather than the threshold issue of immunity. The issue of immunity is often inextricably entwined with the merits of the plaintiff's case, making a decision on one issue impossible without at least cursory examination of the other. A decision which denies qualified immunity necessarily establishes the merits of plaintiff's claim. For this reason, the Secretary's assertion is without merit.

AFFIRMED.

LEVIN H. CAMPBELL, Chief Judge (dissenting).

This is a qualified immunity case. The issue is thus whether defendant in 1985 could reasonably have known that the Constitution prohibited a politically motivated demotion of plaintiff from Executive Director II of the Appeals Board of the Department of Social Services, to his permanent career position of Executive Director I. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). I do not believe that it was clear, simply from the Supreme Court's general remarks in discussing the assistant public defender position at issue in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), that the present action violated the Constitution.[1] Nor was our

circuit precedent at all clear on the issue, then or now.

The post at issue is the Director of the Board of Appeals for the Department of Social Services of the Commonwealth of Puerto Rico. The Department of Social Services is charged with a wide range of responsibilities with regard to "social problems," particularly the distribution of aid to the aged, the needy, and the infirm. The Board of Appeals is the body within the Department that hears all appeals—about 8,000 a year—from persons dissatisfied with benefits decisions rendered by local level officials. The Director's duties, under the OP–16 job description, include

1) supervising all Board personnel, 31 employees altogether;

2) establishing "the necessary procedures to hold the hearings on appeals," in order to ensure impartiality and promptness; and

3) "analyz[ing] and mak[ing] all final decisions on all appeals."

These duties suggest that the Director is a policymaker of considerable importance, since he both administers Board personnel and appeals procedures, and analyzes and makes final decisions on all appeals. For the reasons that follow, I think the way the Director discharges these functions could vary depending upon the philosophy, policies and electoral "mandate" of the party with which he or she is affiliated. An administration from one political party might, therefore, reasonably believe that it would be hard to carry out its policies effectively through a Director who belonged to another party.

In approaching the problem, we should use the analytical framework recent opinions of this court have prescribed for this type of case. *See Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255 (1st Cir. 1987); *Jimenez Fuentes v. Torres Gaztam-*

---

1. *Branti*'s lack of specific guidance beyond its own facts is noted in Judge (now Chief Judge) Gibbons's post-*Branti* opinion for the Third Circuit in *Ness v. Marshall,* 660 F.2d 517 (3d Cir. 1981), holding that a city solicitor could be discharged for partisan political reasons. As Judge Gibbons observes, *Branti*'s examples (be-

yond the disputed assistant public defender post) are limited to a football coach (non-fireable for political reasons) and a governor's speech writer (fireable). Most positions in state and local government are hard to equate to such atypical posts. *Id.* at 520–21.

*bide,* 807 F.2d 236 (1st Cir.1986) (en banc). The purpose of this analysis is to determine if "party affiliation is an appropriate requirement" for a particular position, in acknowledgment of *Branti*'s description of the exception to the general constitutional prohibition of patronage dismissals. *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95. The analysis has two steps. The first is to ask whether the position relates to partisan political interests or concerns. If the answer to this first question is yes, the court proceeds to step two, which is to determine whether the actual responsibilities of the position itself resemble those of a policymaker, a privy to confidential communication, or an officer whose function is such that party affiliation is an equally appropriate requirement. If the answer to both questions is yes, then party affiliation is indeed an appropriate requirement for the job, *i.e.,* persons holding the office have no constitutional protection from patronage dismissal.

The majority in this case proceeds straight to the ultimate question—is party affiliation appropriate—without employing the more structured analysis prescribed in our precedent. Under the requisite analysis, focusing first on the Director's responsibilities as they relate to supervising Board personnel and establishing appeals procedures, I think the answer to the first of the *Jimenez* questions is yes. The key is whether the position is in an area of government in which there is "*room* for political disagreement on goals or their implementation." *Mendez–Palou,* 813 F.2d at 1258 (emphasis in original). *See also id.* at 1259 ("no clearly established constitutional protection against patronage dismissal for those individuals whose positions *potentially* concerned matters of partisan

political interest") (emphasis added). I think there is room for political disagreement about the extent and type of procedures that are appropriate for appeals from benefits terminations or denials. Whether someone appeals successfully may depend on a number of different factors, some of which at least appear to lie within the Director's sphere of influence: What kind of a notice of a person's appeals rights must be provided? What procedures are required for filing an appeal? Is the individual entitled to counsel on appeal? Is the appellant granted access to the file and recommendations of the caseworker (apparently the original decisionmaker)? What exactly must be demonstrated on appeal? What is the appellant's burden of proof? What evidence is referred to? How quickly or slowly will a decision be rendered?

The above seem to me to be questions that may not be answerable solely by reference to technical-legal criteria. The organization, details, elaborateness, efficiency and speed of the appeals process affect the likelihood of claimants' success in receiving benefits—and how much the government, in toto, pays out in benefits. A party favoring liberalized benefits might want a more elaborate appeals process.[2] A party fearful of benefits fraud or hostile to the expense of a benefits program might want a differently designed appeals system. Moreover, a creaky, backlogged appeals system could well be the target of an election year challenge, as could a review program perceived as ineffective to check fraud.[3]

An example of the potential for the politicization of procedural questions can be seen in the present national administration's apparent attempt to check (as it saw it) the untrammelled flow of social security

---

**2.** *But cf. Goldberg v. Kelly,* 397 U.S. 254, 278–79, 90 S.Ct. 1011, 1025–26, 25 L.Ed.2d 287 (Black, J., dissenting) (wondering whether constitutionalizing the administration of a benefits program might deter the state from extending benefits to marginally qualified applicants). *See also Hahn v. Gottlieb,* 430 F.2d 1243, 1246 (1st Cir.1970) (Coffin, J.) (noting that a court, in determining the procedural protections due a recipient of government largess, "must take care lest we kill the goose in our solicitude for the eggs").

**3.** We have previously noted the relevance to the *Branti* inquiry of the fact that a particular job relates to the distribution of services that are of vital importance to the electorate. *See, e.g., Roman Melendez v. Inclan,* 826 F.2d 130, 133 (1st Cir.1987) (discussing *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1985)).

disability benefits by adopting procedural rules and by tougher Disability Review Board decisions. Extensive ideological and political strife ensued, for some are worried about the solvency of the social security benefits fund, while others feel the needs of claimants should prevail. *Cf. Lopez v. Heckler,* 725 F.2d 1489, 1493–95 (9th Cir. 1984) (discussing Secretary's "nonacquiescence" in judicial decisions mandating evidentiary burdens).

This is not to say that one could not *conceivably* leave the operation of the appeals program in the hands of a non-partisan director who would approach all questions as purely technical legal-administrative matters. But as the Third Circuit pointed out—responding to a similar argument relative to the office of city solicitor—the question is not whether party affiliation is a *necessary* requirement for the effective performance of a given office but whether it may be an *appropriate* requirement. *Ness v. Marshall,* 660 F.2d at 521–23. There are many examples in our nation where this sort of governmental problem has been dealt with, in one place, by a non-partisan mechanism, in another by a partisan one. Some cities are run by "strong mayors," elected in partisan elections, while others are run by non-partisan, professional city managers. Some states appoint judges for life, as does the federal government (although by means of a partisan political process), but others elect judges in partisan elections for fixed terms. I do not think it can be said here, as a matter of constitutional law, that the voters and legislature of Puerto Rico may not decide to let the administration in power fill this high-ranking office using partisan criteria. As I say, some of the procedural decisions within the Director's power ultimately may affect the relative liberality and efficiency with which benefits are granted—a political issue, at bottom. Although some might prefer that this sort of position be free from political influence, reasonable arguments certainly can be made for the superior efficacy of a partisan choice.

*Elrod* and *Branti* grant protection to office holders whose removal for partisan political reasons can serve no purpose ex-cept patronage; they do not forbid a democratically elected governor from placing persons of his own political persuasion in leadership positions where such is arguably appropriate to implement the policies of a new administration. I do not read *Elrod* and *Branti* as constitutionalizing Max Weber's Prussian civil service as the only permissible way to govern our country. If *Elrod* and *Branti* were to be so interpreted, they would amount to one of the most drastic constitutional changes by judicial fiat in the history of our nation, spelling an end to much experimentation with different forms of political administration.

Since the duties of the Director include administration of the Board and supervisory control over appeals procedures—*i.e.,* making the Department's policy as to procedures—the answer to the second question in the *Jimenez* analysis is also yes. The Director is plainly a significant policymaker. Thus, because the administration of the Board of Appeals involves issues upon which there is room for political disagreement (question one), and because the Director is in a position to make policy with respect to those political issues (question two), the job is one for which political affiliation is (at least arguably at this stage of the case) an appropriate requirement for effective performance.

I believe this conclusion based on the administrative aspect of the Director's job is itself enough to warrant a finding of qualified immunity. But I also reject the majority's view in regard to the decision-making aspect. The Director here apparently has the last say as to benefits determinations. While many appeals may be susceptible of purely objective "legal" resolutions, others may turn on the decision-maker's honestly held policy choices in areas not strictly regulated by law. There can be legitimate "political" disagreements as to the interpretation and administration of benefits programs, *i.e.,* disagreement sometimes based on whether one puts the granting of liberal benefits ahead of the danger that benefits may be granted to the undeserving. A new administration may feel a given Director is too generous or not generous enough. Thus, the answer to the first question in the *Jimenez* analysis is or

could be yes. And since the Director has the final word in respect to such "gray area" cases, he is a policymaker, making the answer to the second question yes as well.

I concede there is some initial attractiveness to my colleagues' view that adjudicative functions in a state agency should be discharged only by decisionmakers who are protected against partisan discharge. Certainly one would not want welfare benefits to be dispensed on a partisan basis, *i.e.*, with favoritism shown to claimants of a particular political party. But my colleagues go too far when they construe *Elrod* and *Branti* as cases that prevent states and localities from appointing and removing any and all adjudicative decisionmakers on a partisan basis. While the partisan appointment of agency decisionmakers may carry some risk of fraudulent practices, it need not necessarily do so. Federal judges, after all, are appointed on a partisan basis—not to mention many state judges who run for office in partisan contests. These mechanisms are surely not unconstitutional, nor can it be said that most such judges dispense justice in a partisan manner. Here, moreover, we are not considering judicial officers as such, but rather agency officials. While the Director here is expected to be fair and even-handed, he is also an important part of a political administration which is expected to have its own policies regarding the delicate balance between safeguarding the public fisc and helping the needy. Thus in the gray areas of adjudication, where agency policy is sometimes made, I do not find it unthinkable that the chief adjudicator should reflect the political views of the current administration.

The majority analogizes the Director here to the assistant public defender in *Branti*. But unlike the latter, the Director's policymaking power is broad, and his loyalty is owed, through his party, to the public itself. An assistant public defender "makes policy" only in the context of an individual case; moreover, he could not properly be influenced in the conduct of his job by political ideology and loyalty. The unique thing about the public defender position is that the job can only be done ethically one way: by single-minded devotion to the client's interests. *See Branti*, 445 U.S. at 519, 100 S.Ct. at 1295. The same cannot be said of the Director here. Of course, his technical competence may be susceptible to objective evaluation. But as to the adjudicative as well as administrative guts of his job—granting or denying benefits liberally or conservatively, promptly or slowly, establishing procedures—evaluation of his performance may well depend on one's political views and affiliations as well.

In conclusion, I think the Secretary could reasonably have believed that political affiliation was an appropriate requirement for this position. That is the bottom line here. I note also that, although there is a fair amount of existing law on what sorts of policymaking positions are protected, there is little precedent on quasi-judicial positions, or positions where political affiliation may or may not be appropriate for reasons *different* than those implicit in the *Jimenez* analysis. As we have said in many of these patronage dismissal cases, the law's unsettled state in a particular *Elrod-Branti* zone militates in favor of finding qualified immunity. Accordingly, I respectfully disagree with the court's opinion insofar as it concludes that the law was (or is) settled in this extremely controversial and open arena.