Jose Manuel FIGUEROA–RODRIGUEZ,
et al., Plaintiffs, Appellees,

v.

Aurelio LOPEZ–RIVERA, etc.,
Defendant, Appellant.

Luis J. GONZALEZ–GONZALEZ,
Plaintiff, Appellee,

v.

Carmen Sonia ZAYAS, etc.,
Defendant, Appellant.

Victor M. FONTANE–REXACH,
Plaintiff, Appellee,

v.

PUERTO RICO ELECTRIC POWER
AUTHORITY, et al., Defendants,
Appellants.

Nos. 87–1319, 87–1801, 87–1863.

United States Court of Appeals,
First Circuit.

April 25, 1989.

Alice Net Carlo and Garcia Rodon, Correa Marquez & Valderas on supplemental memoranda for rehearing for appellant Aurelio Lopez–Rivera.

Carlos Del Valle, Hector Rivera Cruz, Secretary of Justice, Rafael Ortiz Carrion, Sol. Gen., and Ramirez & Ramirez on supplemental brief for appellant Carmen Sonia Zayas.

Alice Net Carlo and Garcia Rodon, Correa Marquez & Valderas on supplemental memoranda for rehearing for appellants Puerto Rico Elec. Power Authority, et al.

Pedro Miranda Corrada and Hector Urgell Cuebas on briefs for appellees.

Before CAMPBELL, Chief Judge, BOWNES, BREYER, TORRUELLA and SELYA, Circuit Judges.

## OPINIONS EN BANC

BREYER, Circuit Judge.

These three Puerto Rican "political discharge" cases raise a single legal question: do the defendants enjoy "qualified immunity" (protecting them from liability for damages) in dismissing (1) the Director of the Board of Appeals of the Department of Social Services, *Gonzalez–Gonzalez v. Zayas,* 878 F.2d 1500; (2) two Zone Fire Chiefs, *Figueroa–Rodriguez v. Lopez–Rivera,* 878 F.2d 1488; and (3) the Assistant Chief of the Supply Division of the Puerto Rico Electric Power Authority, *Fontane–Rexach v. PREPA,* 878 F.2d 1493. In the

first two instances we conclude that the law, at the time of dismissal, was not "clearly established" in plaintiffs' favor. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255 (1st Cir.1987); *Bonitz v. Fair,* 804 F.2d 164 (1st Cir.1986). Hence, the defendants enjoy "qualified immunity;" and we must therefore reverse the district court holdings that would permit the plaintiffs to obtain damage awards. In the third case, *Fontane–Rexach,* the defendants have not established their right to "qualified immunity," thus the district court's denial of summary judgment on the matter was legally correct.

## I.

██ In each of these cases, the defendant, a government official, dismissed a plaintiff in 1985 from a moderately high level, Commonwealth-government position, allegedly because the plaintiff belongs to the political party that lost the 1984 gubernatorial election. The First Amendment of the Constitution forbids such dismissals unless "party affiliation is an appropriate requirement" for the job in question. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In each case, the defendant asked the district court to dismiss the damage claim on the grounds that, at minimum, *Elrod/Branti* did not *"clearly"* forbid them to act. *Harlow, supra* (government officials enjoy "qualified immunity" where the law does not "clearly" forbid their actions). In each case, the district court denied defendants' motion to dismiss the damage claim, for, in its view, the law was "clear" at the time of dismissal that "political affiliation" was *not* an "appropriate requirement" for the job. The defendants in each case took an interlocutory appeal, *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Bonitz, supra; De Abadia v. Izquierdo–Mora,* 792 F.2d 1187, 1190 (1st Cir.1986); in each case a panel of this court affirmed the district court. The full court has vacated the panel

decisions, and it now reviews the district courts' determinations, en banc.

## II.

Our task is simply to determine whether or not the three jobs in question *clearly* fell outside the scope of the *Elrod/Branti* "political affiliation" exception at the time of the discharges in question (all of which occurred prior to this circuit's recent spate of precedent relative to Puerto Rico employment cases). *See Figueroa–Rodriguez v. Aquino,* 863 F.2d 1037, 1041 (1st Cir. 1988) ("The question here is thus whether it was objectively clear in January 1985, *before* the appearance of any of this court's precedent in the recent flood of Puerto Rico political firing cases, that [plaintiff's] position was one to which political affiliation lacked a valid relation."). In previous cases, we have elaborated our views both about what the exception means, and about how "clear" that meaning is. We shall summarize them briefly:

██ 1. In *Mendez–Palou,* 813 F.2d at 1259, this circuit said that the question in a "qualified immunity" case, such as this one, is "whether [at the time of dismissal] it was clearly established that employees in the *particular positions* at issue, in light of the responsibilities inherent in those positions, were protected from patronage dismissal." (Emphasis in original.) We added that a defendant enjoys "qualified immunity" as long as the job in question *"potentially* concerned matters of partisan political interest and involved at least a *modicum* of policymaking responsibility, access to confidential information, *or* official communication." *Id.* at 1259. (Emphasis added.) And, we have said that "defendants will normally enjoy qualified immunity from damage liability in upper-level, managerial-type job dismissal cases, cases where the jobs in question are not purely technical or scientific in nature." *Juarbe–Angueira v. Arias,* 831 F.2d 11, 14 (1st Cir.1987).

2. We have also explained why we believe that in 1985, it was difficult to determine with clarity whether a moderately high-level government position was entitled

to First Amendment protection. *See generally Mendez–Palou, supra; Juarbe–Angueira,* 831 F.2d at 13–14; *De Abadia v. Izquierdo–Mora,* 792 F.2d at 1194 (Campbell, C.J., concurring); *see also Ness v. Marshall,* 660 F.2d 517 (3d Cir.1981). For one thing, the Supreme Court in *Elrod/Branti* described the exception in general language, using as illustrative examples only obviously nonpolitical jobs, such as a football coach or an assistant public defender. *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95. For another thing, unlike many other areas of law, it is here inherently difficult to use the exception's purpose to define with any degree of certainty the scope of its application. The exception seems designed "to separate instances where (1) a newly elected political party can legitimately replace those who hold important offices in order to carry out its electoral mandate and to provide voters with the confidence it is doing so (*i.e.,* where a 'new broom' ought to 'sweep clean') from (2) pure political patronage (*i.e.,* 'jobs for the boys')." *Juarbe–Angueira,* 831 F.2d at 13. The reason that the exception, even when read in light of this purpose, is far from self-defining is that many areas of government that sound technical (*e.g.,* antitrust, development banks, park services, or, at a more local level, procurement policies, sewage disposal, road maintenance) may, depending on time and circumstance, become "politically charged." Logic does not tell us where and when government matters may become political issues.

Finally, at least through 1985, lower courts applied *Branti*'s exception broadly, finding that First Amendment protection only bars politically motivated dismissals from relatively low level, or highly technical, jobs. (*See Juarbe–Angueira,* 831 F.2d at 16, for a list of those cases.)

■ 3. We have also held, in respect to the Commonwealth of Puerto Rico, that its own civil service classification system, while not "determinative of the *Elrod/Branti* question," is nonetheless "entitled to some deference." *Jimenez–Fuentes v. Torres–Gaztambide,* 807 F.2d 236, 246 (1st Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). That is because (a) Puerto Rico's own civil service system permits a fairly small number of positions (no more than 25 per agency) to be classified as confidential (*i.e.,* potentially subject to politically-based discharge), P.R.Laws Ann. tit. 3, § 1351 (1978 & Supp.1987); (b) the personnel law bases the classification of a confidential position on criteria similar to those enumerated in *Elrod* and *Branti* (whether the job involves "formulation of public policy," P.R.Laws Ann. tit. 3, § 1350, or "direct service to the head or subhead of the agency which require a high degree of personal trust," P.R. Personnel Bylaws: Areas Essential to the Merit Principle, § 5.2 (1976)); and (c) the legislators and administrators are more familiar with the issues and subjects that potentially may affix a particular job at a particular time with a "political charge." In addition, in the context of qualified immunity, the fact that the Commonwealth government had classified a particular job as a trust or confidence position, makes it more difficult to say that a Puerto Rican official should have known that the law "*clearly*" forbids dismissal. *Cf. Rodriguez–Rodriguez v. Munoz–Munoz,* 808 F.2d 138 (1st Cir.1986) (Commonwealth court cases "not conclusive as to the state of the law").

4. So far, this circuit, applying these principles in "qualified immunity" cases involving discharges in 1985, has found, in the vast majority, that the defendants did enjoy qualified immunity in respect to claims of potentially forbidden dismissals. *See Juarbe–Angueira,* 831 F.2d at 16 for a list of cases. We have found no qualified immunity in only two instances: one involved the director of a riding school, *Hernandez–Tirado v. Artau,* 835 F.2d 377 (1st Cir.1987), and the other involved domestic employees (although in the latter case we did not preclude defendants from presenting additional evidence at trial, in light of the fact that the employees worked at the Governor's Mansion), *Vasquez–Rios v. Hernandez–Colon,* 819 F.2d 319, 329 (1st Cir. 1987).

## III.

We now apply these background principles and precedents to the cases before us. In each instance we use and quote from the undisputed job classification questionnaire to determine the likely nature of the positions and the duties. *Mendez–Palou,* 813 F.2d at 1260.

### A.

#### The Director of the Board of Appeals
#### *Gonzalez–Gonzalez v. Zayas*

The plaintiff in *Gonzalez–Gonzalez* held the position of Director of the Board of Appeals of the Commonwealth's Department of Social Services. The Board is attached to the Secretary of the Department. As stated in the classification questionnaire, it hears "appeals from the beneficiaries of the services rendered by the Department throughout the Island, when they are dissatisfied with the decisions rendered by the local personnel in their cases." The Director is the top board official. He is a second-tier Department of Social Services officer, supervised only by the Secretary. The Director's job includes the following responsibilities (among others):

1. Supervise the 31 employees who work for the Board.
2. [E]stablish the necessary procedures to hold the hearings on appeals ... to assure impartiality in the process, as well as the prompt attention of the complaint.
3. Analyze and make final decisions on all appeals.
4. Prepare the annual budgetary request.
5. Recommend to the Directors of the various programs changes in their rules.

Moreover, the Commonwealth has explicitly classified this job as a "trust" position.

In our view, the job, as described by this record material, satisfies the *Mendez–Palou* qualified immunity test. It "*potentially* concern[s] matters of partisan political interest." The Department of Social Services, as we have previously written, develops benefits policies dealing with serious social problems. Its proposed solutions and implementation programs may provoke strong partisan disagreement. *See Raffucci–Alvarado v. Zayas,* 816 F.2d 818 (1st Cir.1987); *Alicea–Rosado v. Zayas,* 813 F.2d 1263 (1st Cir.1987). Certainly, recommendations for changes in matters that affect substantive policy are "potentially" politically controversial. And, changes in procedural policies, such as who has the burden of proof on what type of issue, or the extent to which claimants are entitled to trial-type procedures, while sounding technical to the ear, can also prove politically controversial. Any administrative system designed to distribute funds to eligible recipients risks two different sorts of errors, those of "underinclusiveness" and those of "overinclusiveness" (related to what statisticians call "Type One" and "Type Two" errors). A particular procedural rule, say, a "burden of proof" rule, if it lowers the risk of underinclusiveness (a needy plaintiff will more likely win), may also raise the opposite risk of overinclusiveness (some who are not so needy will also win). Since there is no perfect procedural system, procedural rules typically determine the balance between these two kinds of error. All we now need do is translate this technical-sounding matter into the language of politics: "Our system fails to help many of the poor and needy," or "our system provides welfare to many who do not need it." At once it becomes apparent that the job of designing procedures may carry, at least potentially, a heavy political charge. It becomes apparent that political sensitivity, at least *"potentially,"* could prove a desirable characteristic in the administrators who design, create, or recommend the creation of procedural rules in a politically controversial benefit-distribution system. The Director's job here includes both the creation of procedural rules and the recommendation of substantive program modifications. Thus, as we said, it "potentially concern[s] matters of partisan political interest." Moreover, since the Director's job involves considerable supervision, as well as the recommendation and establishment of policies, it involves more

than "a *modicum* of policymaking responsibility." *Mendez–Palou, supra.*

The district court apparently thought we should create an exception to our *Mendez–Palou* holding. It thought that the Director's job was "clearly" nonpolitical because the Board of Appeals, which he directs, has adjudicative functions. The court analogized the Director's job to that of a chief judge, and it wrote that "the judicial process requires that a judicial officer remain independent of any political party."

■ We, however, would not create an exception to the *Mendez–Palou* requirements for the case before us. For one thing, the Director is *not* a judicial officer; he is an administrative officer with some adjudicative responsibilities. The Executive Branch of, for example, the federal government, contains relatively high-level officials with some adjudicative responsibilities, some of whom a President can remove only "for cause" (*e.g.*, the National Transportation Safety Board, 49 U.S.C. § 1902 (1982)); others of whom he can remove at will (*e.g.*, the Secretary of Agriculture, 7 U.S.C. §§ 2202, 193 (1982)). There are still other such officials as to whom the statute does not specify whether removal is permitted at will or only "for cause" (*e.g.*, the Federal Communications Commission, 47 U.S.C. § 154 (1988), Federal Reserve Board, 12 U.S.C. § 241 (1988)). The examples suggest that the simple fact that an administrator is, in part (even in large part), an adjudicator, does not *automatically* (and *"clearly"*) render "political qualifications" inappropriate. (We also note that state judges often must stand for election, and that Presidents may appoint federal judges with political considerations in mind.)

We do not mean that "administrative adjudicators" are completely free to sway with the changing political winds. The Constitution's Due Process Clause may require insulating them from certain inappropriate pressures. But the extent to which it does so is far from "clear." *Cf., e.g., Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Gibson v. Ber-*

*ryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed. 2d 488 (1973); *American Cyanamid v. Federal Trade Commission,* 363 F.2d 757 (6th Cir.1966). And, in any event, the reach of the Due Process Clause is not before us.

■ These legal and political facts counsel against finding that the Constitution *"clearly"* and automatically gives all adjudicators, including administrative adjudicators, tenure-type insulation from political pressures. Nothing in *Elrod* or *Branti* suggests that the Constitution's First Amendment, the legal provision now before us, in and of itself, *clearly* forbids dismissal on political grounds of a high level administrator with both adjudicative and policymaking responsibilities. For these reasons *Mendez–Palou* applies. And, as we have said, *Mendez–Palou* provides "qualified immunity."

### B.

### The Zone Fire Chiefs

*Figueroa–Rodriguez v. Lopez–Rivera*

■ The plaintiffs in *Figueroa–Rodriguez* each held the position of Zone Fire Chief. Puerto Rico's Fire Department is an island-wide, rather than a municipal, organization. The Department is headed by a Fire Chief, and, reporting to this Chief are four Zone Fire Chiefs, each responsible for one-quarter of the island. Plaintiff Figueroa was the Metropolitan Zone Chief, responsible for San Juan, Rio Piedras, Bayamon and Carolina. He supervised 553 employees. Plaintiff Roig was Chief of the Central Fire Zone, responsible for Caguas, Guayama and Humacao; he supervised 312 employees. Each Zone Chief held one of the twelve Fire Department positions classified as positions of trust.

The undisputed job description for Zone Fire Chief describes the job as comprising:

1. [H]ighly responsible administrative and supervisory work.

2. [P]lanning, directing and supervising the activities of the Fire Department in the zone.

3. [F]ormulation of the policies to be followed with respect to the prevention and extinction of fires.

4. [D]irect supervision over the Chiefs of the District Firemen in their zone and generally over the remaining personnel of the ... Department assigned to the zone.

The description adds that the Zone Fire Chief "[p]erforms his functions with entire freedom of criteria."

The job description goes on to enumerate as "typical examples" of the job the following:

1. Plans, directs, supervises and coordinates the activities of the Fire Department in the Zone under his command.

2. Supervises the personnel assigned to his zone.

3. Sets forth the work plans of the zone and gives follow-up to the same.

4. Directs the task of fire extinction and rescue work in his area.

5. Edits and reviews correspondence and reports on fires and other required aspects of the job.

6. Interprets the laws, regulations and norms applicable to the job.

7. Assumes command over all the fire extinction operations in his zone, unless relieved by the Chief or Assistant Chief of the Fire Department.

8. Maintains a system of work shifts of the Officers assigned to the districts comprised within the zone.

9. Insures that the fire equipment assigned to the zone is always maintained in optimum working conditions.

10. Visits and effects periodic inspections of the fire stations in the zone.

11. Coordinates a plan for inspecting fire hydrants with the Chiefs of District Firemen under his supervision.

12. Coordinates with the Chiefs of District Firemen under his supervision, a plan for effecting inspection visits on factories, businesses, industries and other facilities in the zone as part of the fire prevention program.

13. Prepares reports for the Chief and the Assistant Chief of the agency on the work performed in the zone.

In our view, the Zone Chief, rather like a typical Fire Chief in a large city, holds a job that "*potentially* concern[s] matters of partisan political interests." *Mendez–Palou, supra.* The "planning" of Fire Department activities, the "formulation" of fire "prevention ... policies," the "direct[ion] ... of extinction and rescue work" (all to be carried out "with entire freedom of criteria"), do not sound like purely technical or scientific tasks, particularly given that a major fire (such as the fire at the Dupont Plaza Hotel in San Juan) can produce critical, and public, reexamination of whether, for example, the Department devoted adequate resources to safety checks, whether it had the capacity to respond rapidly enough, or whether it distributed its resources and services efficiently and sensibly among different neighborhoods. High level officials of major service-oriented departments in municipal and state government must adequately take into account competing public needs, matching them with available resources. They must react with sensitivity to anticipated, or actual, public criticisms of their decisions—all of which is to say that they have *politically sensitive* jobs. As the court in *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir. 1985) recognized, to believe that a high official in a (technical-sounding) water department, sewer authority, parks department, or similar activity need not possess these qualities is to fail to understand the realities of local political life. Of course, we recognize that a fire department, like a police department, is an agency that is mostly concerned with public safety and law enforcement. But, we do not believe that fact alone a sufficient distinction to make a difference, at least not in respect to quite high officials who must respond sensitively to the public, and therefore take account of the public's perceptions of the manner in which the department fulfills its responsibilities.

We add that the job description before us shows that the Zone Fire Chief possesses more than "a modicum of policymaking

responsibility." He is, in fact, the alter ego of the Chief in the zone under his supervision. *See Juarbe–Angueira, supra* (regional director of Building Authority); *Roman–Melendez v. Inclan,* 826 F.2d 130 (1st Cir.1987) (regional director of the General Services Administration); *Echevarria v. Gracia–Anselmi,* 823 F.2d 696 (1st Cir. 1987) (regional director of Right to Employment Administration); *Perez–Quintana v. Gracia–Anselmi,* 817 F.2d 891 (1st Cir. 1987) (same); *Raffucci–Alvarado, supra* (regional director of the Department of Social Services); *Alicea–Rosado, supra* (same); *Monge–Vazquez v. Rohena–Betancourt,* 813 F.2d 22 (1st Cir.1987) (regional director of Department of Natural Resources); *Collazo–Rivera v. Torres Gaztambide,* 812 F.2d 258 (1st Cir.1986) (regional director of the Rural Housing Administration for the Department of Housing); *Jimenez–Fuentes v. Torres-Gaztambide, supra* (regional director of Urban Development and Housing Corporation).

In sum, the jobs in question fit within *Mendez–Palou*'s criteria. Nothing in the Supreme Court's *Elrod/Branti* opinions, or their examples of football coach and assistant public defender, permits the conclusion that a job with major civic responsibilities, such as a Zone Fire Chief, "clearly" fell outside their exception.

### C.

### Assistant Chief Supply Division
### *Fontane–Rexach v. PREPA*

■ The third and the most difficult case is that of the Assistant Chief of the Supply Division of the Puerto Rican Electric Power Authority (PREPA). The job is three levels below the Executive Director of PREPA.

The job involves planning, directing, coordinating and supervising PREPA's purchasing activities. The job description in the record says that the tasks performed by the Assistant Chief of the Supply Division include:

1. Formulates and recommends the implementation of norms and procedures to improve the internal operations of the purchasing area of the Division.
2. Is responsible for the publication, review, evaluation, approval and adjudication of bids.
3. Negotiates contracting of services.
4. Evaluates the quality of the products, materials and equipment which ... [PREPA] acquires.
5. Determines the conditions and value of excess and surplus supplies to be sold by ... [PREPA].
6. Is responsible for the sale of obsolete material.
7. Coordinates with the different suppliers of materials and equipments the services related to purchases which these render to ... [PREPA].
8. Coordinates the rendering of the services mentioned with officers of ... [PREPA] and governmental agencies, as required.
9. Recommends and administrates the annual operational budget of the purchasing area.

A panel of this court found that the record indicated this position was highly technical in terms of its duties, and not very high level in respect to organizational rank. It concluded that the defendants had not established a "qualified immunity" defense. We agree with the panel in its decision, though we shall make these observations.

First, we believe it important, as did the panel, that the record does *not* show that Puerto Rico's own civil service system classified the job as a "trust" position *in the sense in which that classification is relevant to our inquiry,* namely, in permitting (as a matter of Commonwealth law) dismissal of an office holder for political reasons. We recognize that Puerto Rico's Personnel law requires governmental agencies that operate as private enterprises, such as PREPA, to adopt personnel regulations embodying the same "merit principle" that governs the Public Service Personnel Law. P.R.Laws Ann. tit. 3, § 1338. We also recognize that PREPA has adopted such regulations, using the same criteria as the personnel law in distinguishing "career"

from "trust" employees. PREPA defines "Trust or Confidence Employees" as those classified in the occupational groups M–VI to M–VIII, Executive Officers and Officers of the Authority and those whose functions are involved in the intervening or collaborating with the hiring authority in the formulation or application of the corporation's public policy, or perform in positions that involve a high degree of personal trust.

Electric Power Authority, Personnel Division, Personnel Regulation, § II (Feb. 24, 1982).

The record does not make clear, however, whether an Assistant Head of the Supplies Division is an "Executive Officer" (or otherwise comes within this definition). Nor does it explain the potential relevance (or non-relevance), of Article 15(b) of PREPA's bylaws, which states that PREPA's "officers ... may be removed by the Executive Director, but only *for cause.*" (Emphasis added.) This by-law, even if literally applicable only to officers, a position higher in rank than Assistant Chief of the Supply Division, would seem to underscore the intended technical nature of the agency. For these reasons we believe the panel correctly refused to give "deference" to Puerto Rico's own classification system. *Jimenez–Fuentes*, 807 F.2d at 246.

Second, without any such deference, it is difficult to see where, in the job description, one could find, even "potentially," any "matters of partisan political interest." The panel opinion elaborates the reasons for this conclusion.

Third, as the panel opinion states, "the defendants ... remain free ... to provide at trial additional evidence to show that ... political affiliation is a suitable criterion for this post." We add that they may submit evidence designed to show that the position "potentially" encompassed "matters of partisan political interest" and that, therefore, they enjoy "qualified immunity" from liability for damages. We reinstate the panel's holding that, on the present state of the record, the district court correctly denied the defendant's motion for summary judgment on these questions.

The determinations of the district court in respect to qualified immunity in *Gonzalez–Gonzalez v. Zayas* and *Figueroa–Rodriguez v. Lopez–Rivera* are

*Reversed.*

Part III of the panel opinion in *Figueroa–Rodriguez v. Lopez–Rivera* (vacating sanctions imposed by the district court) is

*Reinstated.*

The district court's denial of summary judgment in *Fontane–Rexach v. PREPA,* is

*Affirmed.*

The opinion of the panel in *Fontane–Rexach v. PREPA,* is

*Reinstated.*

SELYA, Circuit Judge. (concurring in part and dissenting in part).

I join unreservedly in the majority's treatment of two of these cases, and write separately only to comment on the consolidated appeals concerning the two professional firefighters, Jose Manuel Figueroa Rodriguez and Luis Raul Roig Perez. As I stated in the panel opinion in the firefighters' cases, 878 F.2d 1488, I continue to see "a fundamental difference between a public safety agency, such as the Fire Service or a police department, on the one hand, and a social service agency on the other." *Id.* at 1490. Although I admire the force of Judge Breyer's arguments on the point, *ante* at 1484–1485, I remain of the opinion that the ultimate question should have been reserved for trial, and the district court's denial of summary judgment at this stage of the proceedings should be affirmed. To that extent, I respectfully dissent from the majority's disposition of Nos. 87–1319 and 87–1320.

TORRUELLA, Circuit Judge (Concurring in part; dissenting in part).

I concur with the majority's conclusion that qualified immunity is not available as a defense to the political discharge of the Assistant Chief of the Supply Division of the Puerto Rico Electric Power Authority.

My concurrence relies, however, on the reasoning of the panel opinion. *See Fontane–Rexach v. Puerto Rico Electric Power Authority, et al.*, 878 F.2d 1493 (1st Cir.1988). I dissent from that part of the Court's opinion that holds that the political discharges of the Director of the Board of Appeals of the Department of Social Sciences and the two Zone Fire Chiefs of the Puerto Rico Fire Department are subject to qualified immunity defenses.

Because I find it difficult to improve upon either Judge Caffrey's excellent opinion in *González–González v. Carmen Sonia Zayas*, 878 F.2d 1500 (1st Cir.1988), or Judge Selya's equally cogent conclusions in *Figueroa–Rodriguez v. Aurelio López–Rivera*, 878 F.2d 1488 (1st Cir.1988), rather than engage in judicial plagiarism I rely on them as the principal basis for my dissent and refer the reader to their full text published immediately hereafter. I thus limit myself to some brief remarks mandated by several of the majority's innovative arguments to justify the political discharge of a judicial officer [1] and two firemen.

The majority argues that the judicial officer holds a political post because its incumbent can make "changes in procedural policies, such as who has the burden of proof on what type of issue, or the extent to which claimants are entitled to trial-type procedures, [which] while sounding technical to the ear, can also prove politically controversial." *Ante* at 1482. To say the least, such an argument is difficult to comprehend much less accept. It can only be made in the context of this Circuit's standard, which considers *any* activity as *potentially* political and in which nothing is excluded. *Cf. Figueroa–Rodriguez v. Aquino*, 863 F.2d 1037, 1049 (1st Cir.1988) (Torruella, J., dissenting). I suppose under this standard the political discharge of a National Guard chaplain would be condoned because even religion can potentially

be dragged into the partisan political arena. Much time and energy would be saved if the majority would announce *de jure* its *de facto* rule to the effect that all government activity is potentially political and thus formally eliminate this non-test from the books. *Cf. De Choudens v. Government Development Bank*, 801 F.2d 5 (1st Cir. 1986).

Equally fallacious is the majority's argument to the effect that "an adjudicator, does not *automatically* (and '*clearly*') render 'political qualifications' inappropriate.... ([because it is noted] that state judges often must stand for election, and that Presidents may appoint federal judges with political considerations in mind)." *Ante* at 1483 (emphasis in the original). This is an unfortunate argument which totally misses the point. What is at issue in this appeal is the *discharge* of an adjudicator for partisan political membership. Even in those states where judges are by law elected officials, they cannot be *discharged* during their term of office for partisan political reasons. Like all elected officials, of course, they can be voted out of office once their term expires. But they cannot be *removed* from office during their term for partisan reasons. I assume that the majority will agree that as far as removal from office is concerned the situation with federal judges is totally inapposite to the present one.

I suppose that if this Court can be convinced that the adjudicative process can be political, there is no way to prevent it from reaching the same conclusion with respect to the putting out of fires. I must, however, forcefully point out that firefighters, like adjudicators, are "politically-neutral, technical, and professional employees" pursuant to established Circuit precedent, one which the majority blithely ignores. *De Choudens*, 801 F.2d at 9.

I dissent as indicated.

---

1. Contrary to the majority's view, the job description of the Director of the Board of Appeals does *not* reflect "an administrative officer with some adjudicative responsibilities," *ante* at 1483, but rather an adjudicator whose principal duty is deciding in an impartial manner "appeals from the beneficiaries" of programs administered by the Department of Social Sciences, *id.* at 1482, and who also has *some* administrative duties.